# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

XODUS MEDICAL INC.,
ALESSIO PIGAZZI and
GLENN KEILAR,

        Plaintiffs,

v.

U.S. SURGITECH, INC.

        Defendant.

No. 1:19-cv-03164
Judge Franklin U. Valderrama

## ORDER

Some surgical procedures require a patient to be placed on an operating table that tilts. However, there is a risk that a patient may slide when the operating table is tilted. Alessio Pigazzi (Pigazzi) and Glenn Keilar (Keilar) (collectively, the Inventors) are the owners of Patent No. 8,511,314 ("the '314 patent"), Patent No. 8,464,720 ("the '720 patent"), and Patent No. 9,161,876 ("the '876 patent") which address this problem. Each patent pertains to a method, apparatus, and kit for securing a patient onto an operating table when the patient is in the Trendelenburg[1] or similar positions. Xodus Medical Inc. (Xodus), the exclusive licensee of the '314 patent, the '720 patent, and the '876 patent (collectively the Patents-in-Suit), developed the PINK PAD, a viscoelastic foam pad that provides support for a patient

---

[1]The Trendelenburg position is a surgical position where the patient lies flat on their back, with their feet raised higher than their head. *See* R. 38, Joint App'x at JA00338. Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

1

on an operating table in various surgical positions, including the Trendelenburg position. Plaintiffs, Pigazzi, Keilar, and Xodus (collectively, Xodus[2]) accuse Defendant U.S. Surgitech, Inc. (Surgitech) of infringing on the patents-in-suit through its manufacture, marketing, and sale of its SurgyPad. The parties have briefed the construction of the Patents-in-Suit's disputed claims. The construction of the disputed claim terms is set forth below.

## Background

### A. Procedural History

Xodus filed suit on May 10, 2019 alleging patent infringement against Surgitech. R. 1, Compl; R. 24, FAC ¶¶ 18–28. The '314, '720, and '876 patents which Surgitech is alleged to have infringed, pertain to a pad designed to be placed on a medical procedure table that secures a patient when tilted. The allegedly infringing product, the SurgyPad, is manufactured, marketed, and sold by Surgitech. FAC ¶ 18. The SurgyPad is a "Trendelenburg Patient Positioner" that is used in securing and positioning a patient on an operating table for use in surgery. *Id*. ¶¶ 19, 74. This case was assigned to the Honorable Charles R. Norgle, Sr. until his retirement effective October 4, 2022. *See* R. 61. Xodus and Surgitech filed claim construction briefs, as well as additional supplemental briefs in lieu of a *Markman*[3] hearing. R. 59, Pls. Supp. Br.; R. 60, Def. Supp. Br. Following the filing of the supplemental briefs and

---

[2]Although the Court refers to Plaintiffs collectively as Xodus, the Court uses singular pronouns throughout this Opinion.

[3]A *Markman* hearing is a hearing in order to construe the claims of the patents at issue. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

Judge Norgle's retirement, this case was reassigned to this Court on October 6, 2022. R. 61.

### B. The '720 Patent

The '720 patent issued from U.S. Patent App. No. 13/737,552, filed on January 9, 2013, and is a Continuation in-part of U.S. Patent App. No. 13/346,852, filed on January 10, 2012. Joint App'x at JA00086.[4] The '720 Patent is directed to a method, apparatus, and kit for securing a patient onto an operating table when the patient is in the Trendelenburg position. *Id*. Pigazzi and Keilar are listed as the Inventors. *Id*. A terminal disclaimer was filed on April 30, 2013, in order to overcome a potential double patenting rejection, which is not at issue in the present matter. *Id*. at JA00251. A Notice of Allowance was issued on May 13, 2013, and the patent was subsequently issued on June 18, 2013. *Id*. at JA00307–310.

### C. The '314 Patent

The '314 patent issued from U.S. Patent App. No. 13/773,290, filed on February 21, 2013, which claims priority to U.S. Provisional App. No. 61/654,339, filed on June 1, 2012, and is a Continuation of the '720 patent. Joint App'x at JA00351. The '314 Patent is directed to a method, apparatus, and kit for securing a patient onto an operating table when the patient is in the Trendelenburg position. *Id*. Pigazzi and Keilar are listed as the Inventors. *Id*. In May 2013, the examiner issued a Non-Final Rejection in which claim 10 was rejected as anticipated by West (2010/0275377) (West) and claims 11 through 20 were rejected as obvious and unpatentable over West

---

[4]The Court refers to the entire Joint Appendix (R. 138–138-8) collectively as "Joint App'x" followed by the JA bates number used by the parties.

3

in view of Tursi, Jr. *et al.* (6,653,363) (Tursi). *Id*. at JA00459–461. The Inventors overcame the anticipation rejection by distinguishing the "pad" from the body anchoring portion of West. *Id*. at JA00498. The Inventors overcame the obviousness rejection by pointing out that the "deformable material" in the invention was distinct from the "polyurethane foams" of Tursi as the foams were not configured to have a depression formed therein. *Id*. at JA00499. Additionally, the invention was distinguished from West as the invention describes a "substantial portion of the holding forces" being provided by the depression a patient makes when positioned atop the "deformable material" rather than entirely from straps, as is disclosed by West. *Id*. Subsequently, a Notice of Allowance was issued on July 17, 2013, and the patent was subsequently issued on August 20, 2013. *Id*. at JA00525, JA00536.

### D. The '876 Patent

The '876 patent issued from U.S. Patent App. No. 13/957,778, filed on August 2, 2013, which claims priority to U.S. Provisional App. No. 61/654,339, filed on June 1, 2012, and is a Continuation of the '314 patent. Joint App'x at JA00603, JA00608. The '876 Patent is directed to a method, apparatus, and kit for securing a patient onto an operating table when the patient is in the Trendelenburg position. *Id*. at JA00603. Pigazzi and Keilar are listed as the Inventors. *Id*.

In March 2015, the examiner issued a Non-Final Rejection in which issues of indefiniteness and nonstatutory double patenting were flagged, none of which are at issue in the present matter. *Id*. at JA00714–724. Subsequent to the Inventors addressing Examiner's Office Action, a Notice of Allowance was issued on August 28,

2015, and the patent was subsequently issued on October 20, 2015. *Id.* at JA00776, JA00788.

## Legal Standard

"A determination of patent infringement is a two-step process in which the Court first construes the claims." *Cybor Corp., v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). Claim construction, the interpretation of the patent claims that "define the scope of a patentee's rights under a patent, is a matter of law exclusively for the court." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). The language of the claims is the starting point for all claim construction analysis because it frames and ultimately resolves all issues of claim interpretation. *Robotic Vision Sys., Inc., v. View Eng'g, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997). A claim term takes on its ordinary meaning unless the patentee demonstrates an intent to deviate from that meaning, such as by "acting as his own lexicographer," or by "disavowing the full scope of a claim term either in the specification or during prosecution." *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014) (cleaned up).[5] In the absence of an express intent by the patentee to impart a novel meaning to a claim term, the words are presumed to take on the ordinary and customary meaning attributed to them by those of ordinary skill in the art  in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005). "[T]he

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including specification." *Id*. at 1313.

To construe claim language in a patent, courts "first look to, and primarily rely on, the intrinsic evidence," which "includes the claims themselves, the specification, and the prosecution history of the patent." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013) (cleaned up). When analyzing the intrinsic evidence, courts begin with the language of the claims themselves, applying a "heavy presumption that claim terms carry their ordinary meaning as viewed by one of ordinary skill in the art." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) (cleaned up).

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *see also Sunovion Pharms.*, 731 F.3d at 1276 (noting that the intrinsic evidence is "usually dispositive") (citations omitted). In those cases, it is improper to rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert testimony, inventor testimony, dictionaries, and other "evidence which is external to the patent and file history." *Vitronics Corp.*, 90 F.3d at 1583–84 (citations omitted). Extrinsic evidence, however, may be considered "if needed to assist in determining the meaning or scope of technical terms in the claims." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995) (citation omitted). In other words, it may be consulted to ensure

that a court's construction of a claim "is not inconsistent with clearly expressed, plainly apposite and widely held understandings in the pertinent technical field." *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1346 (Fed. Cir. 2003) (cleaned up). Extrinsic evidence in general, however, is considered "less reliable than the patent and its prosecution history in determining how to read claim terms," *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013) (cleaned up), and "may not be used to vary or contradict the claim language" and specification, *Vitronics Corp.*, 90 F.3d at 1584 (citation omitted).

## Analysis

### I.     Preliminary Issues

#### A. Extrinsic Evidence and the Admissibility of Expert Testimony.

In its opening brief, Surgitech cites several Exhibits (R. 39-3–39-7, Exhs. C–G), which constitute extrinsic evidence, as support for its proposition that the hydroxyl number is an important aspect of the deformable material such that a person of ordinary skill in the art (POSITA) understands the boundaries of the claims. R. 39, Def. Br. at 9–10. Xodus objects to Surgitech's use of extrinsic evidence because Surgitech fails to define the skills necessary to qualify as a POSITA with respect to the Patents-in-Suit and provides no expert opinion on why its extrinsic evidence should be considered. R. 41, Pls. Resp. at 9–10. However, although Xodus cites authority in support of the proposition that attorney argument is not evidence, it cites to no authority stating that a party must introduce all extrinsic evidence in support of claim construction via an expert declaration. *Id.* at 10 (citing *Icon Health & Fitness,*

*Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017)). "Unsupported and underdeveloped arguments are waived." *Lewis v. Mills*, 677 F.3d 324, 332 (7th Cir. 2012) (cleaned up). The Court will not accept Surgitech's unsupported attorney arguments as evidence, but will consider Exhibits C through G as appropriate.[6]

On the other hand, Xodus submits the declaration of Glenn DePhillipo, an expert in the production of flexible foam, particularly polyurethane foam. R. 41-1, Exh. A, DePhillipo Decl. DePhillipo opines that a POSITA must have at least five to seven years of technical experience in the production of viscoelastic polyurethane foam. *Id.* ¶ 15. This experience, submits Xodus, is crucial because it conforms with the Patent and Trademark Office's understanding that the "hypothetical [POSITA] to which the claimed subject matter pertains would, of necessity have the capability of understanding the scientific and engineering principles applicable to the pertinent art." Pls. Resp. at 9–10 (quoting MPEP § 2141.03).

Surgitech objects to Xodus' reliance on DePhillipo's declaration on the basis that the expert testimony is provided from a present-day perspective rather than from the perspective of a POSITA at the time of invention, as required. R. 42, Def. Reply at 3–4; *Phillips*, 415 F.3d at 1313 ("[The] ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."). Surgitech, however, advances no argument as to why it contends that DePhillipo's perspective is not from a person of

---

[6]Xodus also argues that the Court should disregard Exhibit G, which Surgitech cites for the steps of ASTM D3574, as it does not actually include the steps of the applicable test. Pls. Resp. at 10. As discussed below, *see infra* Section II.F, the Court finds Exhibit G supports Xodus' position more than it supports Surgitech's, and considers it to that extent.

skill in the art (POSITA) at the time of invention. In the absence of any argument or authority supporting this contention, *see Lewis*, 677 F.3d at 332, the Court sees no reason why the declaration should not be relied upon when appropriate.

In construing claims, extrinsic evidence plays an important role in conjunction with the intrinsic evidence. *Phillips*, 415 F.3d at 1317. While it is less significant than the intrinsic record when determining the legally operative meaning of claim language, it still may play a role in claim construction if the intrinsic evidence on its own does not any ambiguity. *Id*. District courts have express authorization to rely on extrinsic evidence. *Id*.

The Court will rely on extrinsic evidence only when intrinsic evidence does not inform the Court as to the meaning of the claim language. *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378 (Fed. Cir. 1998) (stating that resorting to extrinsic evidence is unnecessary if the intrinsic record properly informs the court as to the meaning of the claim language).

**B. Deference to the Tennessee District Court's Construction.**

The parties have informed the Court that Xodus is currently involved in a separate patent infringement action, *Xodus v. Prime Medical, LLC*, No. 18-cv-413 (E.D. Tenn.) in Tennessee (the Tennessee Matter). Def. Br. at 10–11; Pls. Resp. at 10–11. Surgitech is not a party to the Tennessee Matter.

Surgitech argues that while the court in the Tennessee Matter adopted a construction of the term "deformable material," this Court should not follow that construction because the Tennessee court did not have the benefit of analyzing the

prosecution history or industry standard. Def. Br. at 10. Furthermore, asserts Surgitech, collateral estoppel bars Xodus from arguing the previous construction of "deformable material" is binding on this court. *Id.* at 11 (citing *In re Trans Texas Holdings Corp.*, 498 F.3d 1290, 1299 (Fed. Cir. 2007)). Therefore, submits Surgitech, the Court is not bound by the Tennessee court's construction.

Xodus concedes in its Response that the Court is not bound by the Tennessee court's construction of the term "deformable material." Pls.' Resp. at 11–12. While not explicitly argued, Xodus suggests that issue preclusion may bar the Court from disregarding the Tennessee court's claim construction of "deformable material." *Id.* Not so.

As an initial matter, the "law of the regional circuit applies to the issue of collateral estoppel." *RF Delaware, Inc., v. Pacific Keystone Technologies, Inc.*, 326 F.3d 1255, 1261 (Fed. Cir. 2003). Collateral estoppel, or issue preclusion, generally "shields a defendant from having to litigate issues that have been fully and fairly tried in a previous action and decided adversely to a party." *Pharmacia & Upjohn Co., v. Mylan Pharm., Inc.*, 170 F.3d 1373, 1379 (Fed. Cir. 1999). The party asserting issue preclusion has the burden of establishing: (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been litigated; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must have been fully represented in the prior action. *Wash. Group Int'l., Inc. v. Bell, Boyd & Lloyd, LLC*, 383 F.3d 633, 636 (7th Cir. 2004). To the extent Xodus takes the position that claim

10

preclusion applies, Xodus fails to meet its burden. For starters, Xodus fails to address the issue preclusion factors in its brief. No matter, as Surgitech is a not party to the Tennessee litigation and therefore, the doctrine of issue preclusion may not be invoked against it.

Xodus also posits that the Court owes some deference to the Tennessee court's claim construction. Pls. Resp. at 10–12. (citing *In Abbott Laboratories v. Dey, L.P.*, 110 F. Supp. 2d 667, 671-672 (N.D. Ill. 2000); *CoStar Realty Info., Inc. v. CIVIX-DDI, LLC*, 2013 WL 5346440, at *4–5 (N.D. Ill. Sept. 23, 2013)). Surgitech retorts that *CoStar Realty Info.* does not stand for the proposition that the Court owes deference to a prior claim construction. Def. Reply at 15 (citing *CoStar Realty Info.*, 2013 WL 5346440, at *4–5). True, courts in this District do not give "complete deference to prior non-preclusive district court claim constructions," but, as the court in *CoStar Realty Info.* stated, courts can treat prior claim construction opinions "as persuasive authority." 2013 WL 5346440, at *5. Accordingly, the Court agrees with Xodus that the Court may give at least some—if not complete—deference to the court's construction of "deformable material" in the Tennessee Matter.

The Court having addressed the preliminary matters, now turns to the parties' competing constructions of the disputed claim terms.

## II.     Claim Construction

### A. Term 1: "DEFORMABLE MATERIAL" / "VISCOELASTIC PAD" ['314 Patent Claims 1, 3, 17, 18, 23 and 24; '876 Patent Claims 1, 3, 17 and 18; '720 Patent Claims 1, 6, 8, 10 and 12]

| Xodus' Proposed Construction | Surgitech's Proposed Construction |
|---|---|
| "**Deformable material**" – Plain and ordinary meaning.<br><br>Alternatively, "foam material."<br><br>"**Viscoelastic pad**" – Plain and ordinary meaning. | "**Deformable material**" – "a viscoelastic foam material formed as a closed-cell polyurethane foam which has been blended with an MDI (or TDI), the end product has a hydroxyl number greater than 100 mg KOH/g [polyol].[7]<br><br>"**Viscoelastic pad**" – "a pad comprised of deformable material." |

Surgitech argues that its proposed construction is consistent with the intrinsic evidence and with the understanding of a POSITA skilled in the surgical pad industry. Def. Br. at 5.

Beginning with the specification, it points out that the term "deformable material" is not mentioned or explained within the patents. Def. Br. at 6. Therefore, reasons Surgitech, the Court must look for similar terms in the specifications to understand the Inventors' intended use of the term. *Id*. The only discussion of the term "deformable material," submits Surgitech, is used in the specification related to "viscoelastic foam material." *Id*. Surgitech maintains that a viscoelastic foam material is the only material used for the pad that achieves the desired claimed function of "holding the patient in a desired position on an inclined support

---

[7]Surgitech's opening brief used the term "Propolyol," which Xodus pointed out in its Response is not used in the art of foam production, and thus treated the term as a typographical error. Resp. at 10 (citing DePhillipo Decl. ¶ 20). In Reply, Surgitech clarifies that "Propolyol" was a typographical error and the proper term is "polyol." Def. Reply at 5.

table . . . to assist in minimizing sliding, shifting or similar undesirable movements of the patient on the support table." *Id*. (citing Joint App'x at JA00042). Surgitech points out that every citation relied upon by Xodus in its Response to support its construction uses the words "viscoelastic foam" and not "deformable material." Def. Reply at 5. Given the consistent and exclusive use of "viscoelastic foam" in reference to the "deformable material," Surgitech concludes that narrowing the construction to a single embodiment is proper. Def. Br. at 6–7 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002) (when the patent specification describes the particular claim structure at issue in a patent infringement suit as "important to the invention," the claim term may be interpreted as limited to the structure described in the specification and shown in the patent drawing)); Def. Reply at 5–6 (citing *Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1309 (Fed. Cir. 2017) ("[W]e think it is entirely appropriate to limit the term 'efficiently mixing' to the sole portion of the specification that adequately discloses 'efficiently mixing' to the public.")).

Moving on to the prosecution history, Surgitech questions the composition of the "deformable material." Def. Br. at 7. Surgitech explains that the exchange of communication with the Patent Office demonstrates how the claimed "deformable material" must be a viscoelastic foam, as a specific formulation of the material is needed to achieve the desired results. *Id*. Surgitech points to the Notice of Allowance which discusses a "pad arrangement" that produces the desired deformation. *Id*. The "pad arrangement," observes Surgitech, is referred to throughout the prosecution history as ". . . a viscoelastic polyurethane foam. . ." configured to form a depression

in the material. *Id.* (citing Joint App'x at JA00658). Additionally, Surgitech points to the Inventors' words explaining that the viscoelastic foam "may be a polyurethane foam made by mixing polyhydroxy polyol with toluene di-isocyanate or other and different methods as are known in the art. For example, Toluene di-isocyanate may be used in combination with polyester polyols and polyether to make viscoelastic foam." *Id.* at 8 (citing Joint App'x at JA00636, JA00497–498). This formula, Surgitech contends, is what distinguishes the claimed "deformable material" from a polyurethane disclosed in the prior art, pointing to the Inventors' remarks to the examiner in which they state, "Tursi [prior art] only discloses the composition of polyurethane foams, but certainly does not disclose a deformable material configured to have a depression formed therein." Def. Br. at 8 (quoting Joint App'x at JA00499). While Xodus emphasizes the physical properties of the material when construing the term, Surgitech argues that the physical properties are inextricably linked to the composition, particularly in light of the Inventors' statements during the prosecution history. Def. Reply at 6. This is because "[t]here is no teaching in . . . Tursi [prior art] that the 'viscoelasticity of the viscoelastic foam would help retain a patient.'" *Id.* (quoting Pls. Resp. at 16 (quoting Joint App'x at JA02752)).

Surgitech next turns to extrinsic evidence in claiming that its construction is consistent with the understanding of a POSITA skilled in the surgical pad industry. Def. Br. at 8. Citing to industry standard, Surgitech explains that the claimed "deformable material" "must be a closed cell polyurethane foam that has been blended with an MDI with the hydroxyl number being greater than 100mg KOH/g polyol." *Id.*

14

Surgitech emphasizes the role that the "hydroxyl number" plays in determining the physical properties and characteristics of polyurethane to justify the addition of a specified hydroxyl number to its proposed construction. *Id*. at 9 (citing R. 39-3, Exh. C; 39-4, Exh. D; 39-5; Exh. E; 39-6, Exh. F). Furthermore, Surgitech argues in Reply that Xodus' own expert says that the "deformable material" "must be at least viscoelastic material – 'that would bring the deformable material ***into the realm of viscoelastic foam*** that are recited in the asserted claims.'" Reply at 4 (citing DePhillipo Decl. ¶21 (emphasis added)).

Finally, Surgitech attacks Xodus' construction, arguing that its construction has no boundaries as to provide any meaningful limitation. Def. Supp. Br. at 7. Thus, concludes Surgitech, Xodus' construction is indefinite. *Id*. Surgitech focuses on the physical properties of the material, such as a "rate of recovery sufficiently slow" and the ability of the material to "provide a holding force" in alleging indefiniteness. *Id*. at 8. This indefiniteness would be cured by defining a composition as the desired physical properties would be innate to a specific composition. *Id*. The composition outlined in Surgitech's construction, Surgitech argues, would provide the limitations necessary for definiteness. *Id*. Additionally, Surgitech turns to Xodus' expert, stating that DePhillipo admits that the deformable material of the claim must be a viscoelastic foam and that "foam is formed by reacting a polyol or polyols with an isocyanate, such as MDI and TDI." *Id*. (quoting DePhillipo Decl. ¶ 23).

In short, Surgitech proposes that the term "deformable material" should be construed as "a viscoelastic foam material formed as a closed-cell polyurethane foam

which has been blended with an MDI (or TDI), the end product has a hydroxyl number greater than 100 mg KOH/g [polyol]." Def. Br. at 5.

For the same reasons outline above, Surgitech argues that "viscoelastic pad" should be construed to mean "a pad comprised of deformable material." Def. Br. at 11. Surgitech also points to the prosecution history as consistent with the pad being a deformable material: "positioning a patient on said viscoelastic pad and thereby deforming said viscoelastic pad . . . ." *Id.* (quoting JA00400–401, JA00047).

In Response, Xodus asserts that "deformable material" should be construed in accordance with its plain and ordinary meaning. Pls. Resp. at 12. Alternatively, posits Xodus, if the Court concludes that construction is necessary, then the Court should adopt the same construction of "foam material" as the Tennessee court. *Id.*

Xodus begins its rebuttal by looking to the claim language itself. Pls. Resp. at 12–13. In doing so, Xodus points out that Surgitech's construction reads redundancies into the term "deformable material," as it is already modified by additional features and limitations within the claim. *Id.* at 13. Moreover, Xodus contends that those redundancies would be accompanied by improperly imported limitations from the specification. *Id.* at 14. These limitations being "a viscoelastic foam" and the specification's exemplary composition of the two possible isocyanates, MDI and TDI, that may be combined with a polyol to form "a viscoelastic foam." *Id.* Xodus insists that not only is it improper to import limitations from a single embodiment in the specification, but there also exists no support for Surgitech's construction limiting the term to a closed cell foam. *Id.* Xodus adds that such a limitation would result in a

16

rigid foam rather than a foam that would be flexible at operating rooms temperatures. *Id*.

Next, Xodus challenges Surgitech's reliance on the prosecution history. Pls. Resp. at 15. Predictably, Xodus disagrees that the prosecution history supports Surgitech's claim that a composition must be defined. *Id*. Xodus points out that the Tursi prior art was never cited by the Patent Trial and Appeal Board (PTAB) for either teaching a specific formulation of foam, or for supporting a patient on a tilted table. *Id*. at 16 (citing Joint App'x at JA02745–2747, JA02750, JA02754). In the words of the PTAB, "[t]here is no teaching in . . . Tursi that the viscoelasticity of viscoelastic foam would help to retain a patient on a tilted medical procedure table." Joint App'x at JA02752. Put simply, the Inventors overcame the Tursi reference by focusing on the foam's capabilities rather than the composition. Thus, reasons Xodus, Surgitech improperly focuses on composition rather than capability in its proposed construction. *Id*. at 16; Pls. Supp. Br. at 5.

Moving from the prosecution history, Xodus then turns to extrinsic evidence. Pls. Resp. at 16. Here, Xodus relies entirely on DePhillipo's expert declaration to rebut Surgitech's construction. *Id*. at 13–15. A POSITA, contends Xodus, would focus on the physical properties of a material rather than the composition, to determine whether viscoelasticity is exhibited. *Id*. at 16–17.

As it pertains to Surgitech's construction of "viscoelastic pad," Xodus argues that there is no special meaning for "pad" in the intrinsic evidence and that a POSITA

in the art of foam production would not construe the term in accordance with Surgitech's construction. Pls. Resp. at 17.

The Court begins its assessment of each parties' construction. Surgitech's proposed construction requires assessing the language of its proposed construction in parts. The Court dissects the proposed construction as follows:

1. a viscoelastic foam material;

2. formed as a closed-cell polyurethane foam which has been blended with an MDI (or TDI), the end product has a hydroxyl number greater than 100 mg KOH/g propolol.

The Court first determines whether each section of the proposed language is supported by the specification. "[T]he descriptive part of the specification aids in ascertaining the scope and meaning of the claims inasmuch as the words of the claims must be based on the description. The specification is, thus, the primary basis for construing the claims. . . . [T]he specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Phillips*, 415 F.3d at 1316 (cleaned up). The first section of Surgitech's proposed construction narrows the scope of the deformable material such that it must be made from "a viscoelastic foam material." While the specification does not go as far as to define the deformable material in such a way, the pad of which the deformable material comprises, is repeatedly described as a "viscoelastic foam pad." *See* Joint App'x at JA00013–24, JA00042–52, JA00072–82. Whether the Court should read in this limitation from the specification into the claim language is the issue.

18

Relying on *Medicines Co.*, Surgitech invites the Court to read in limitations from the specification into the claim. Def. Reply at 6 (citing 853 F.3d at 1309). The Court declines the invitation. In *Medicines*, the patents at issue involved pharmaceutical formulations or batches of a drug used to prevent blood clotting in patients undergoing cardio catheterization. 853 F.3d at 1309. The Federal Circuit concluded that a single embodiment was the only description of the claim term in the patent that could shed light on how the term should be construed. *Id*. Similarly, here no other deformable material is contemplated in the specifications of the Patents-in-Suit. Def. Reply at 5–6. *Medicines*, however, provides further clarity as to why such a narrow construction was appropriate in that case. *Medicines Co.*, 853 F.3d at 1309. Critical to the court's limiting construction in *Medicines* was that the patentee relied on the single embodiment to overcome prior art cited during the prosecution history. *Id*. This is in keeping with the standard that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (cleaned up). The Federal Circuit in *Phillips* also cautioned against construing a claim as being limited to a single embodiment outlined in the patent. 415 F.3d at 1323. This is because a POSITA "rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id*. Given the repeated and exclusive use of "a viscoelastic foam material" throughout the

specification, it would not be unreasonable for a POSITA to confine the scope of the term to this singular construction, but it is not required.

The Court next looks to the prosecution history. In addition to consulting the specification, courts should consider the patent's prosecution history, if it is in evidence, as it may inform "the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citations omitted). Surgitech argues that the disclaimer required for the single embodiment to be read into the specification is present. Def. Reply at 6–7. While it is true that the Inventors' statements in the prosecution history also exclusively use "viscoelastic foam" in their conversations with the examiner, Surgitech does not point to any statements that rise to the level of disclaimer or manifest exclusion required by *Hill-Rom Servs.* to read the limitation into the claim term. 755 F.3d at 1372. And in the cases cited by Surgitech in Reply, the court relied on more explicit disclaimers from inventors made in order to overcome prior art. *See Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1273–75 (Fed. Cir. 2001); *Day Int'l, Inc. v. Reeves Bros., Inc.*, 260 F.3d 1343, 1349 (Fed. Cir. 2001); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576–77 (Fed. Cir. 1995).

The Court agrees with Xodus that the statements relied on by Surgitech are exemplary and not explicitly limiting. Pls. Supp. Br. at 4. The Court finds that the statements made during the prosecution history that Surgitech argues support

reading "deformable material" as "a viscoelastic foam," are at best ambiguous and as such, do not support reading the proposed embodiment into the claim. *Id.* (citing *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) (declining to apply prosecution disclaimer where the alleged disavowal is at best ambiguous and not explicit)).

The extrinsic evidence also fails to save Surgitech's proposed construction. Surgitech cites Xodus' expert declaration to assert that the deformable material must be a viscoelastic foam, despite arguing that it is improper to admit the expert declaration. Def. Reply at 7. Xodus' expert, however, describes the behaviors of a viscoelastic foam, "such as the rate of recovery and maintenance of the depression," to posit that the deformable material as claimed would exhibit similar behaviors. DePhillipo Decl. ¶ 21. This is not an admission that the deformable material must be a viscoelastic foam as Surgitech contends. Thus, Surgitech fails to find support within the extrinsic evidence that supports reading "deformable material" as "a viscoelastic foam."

The next section in Surgitech's construction similarly falls short. "Formed as a closed-cell polyurethane foam" has no support in the specification as there is no mention of a closed-cell polyurethane foam in the Patents-in-Suit. Joint App'x at JA00013–24, JA00042–52, JA00072–82. Surgitech relies solely on extrinsic evidence to support this part of the construction. Def. Br. at 8–10. Regarding the composition of the foam, the specification touches on an exemplary construction from which the foam may be made. Joint App'x at JA00018, JA00046, JA00076. This, however, raises

21

again the question of whether limiting the claim to a single embodiment is appropriate. As with "a viscoelastic foam," for a single embodiment to limit a claim, "the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs.*, 755 F.3d at 1372 (cleaned up). No such disclaimer is present in the specification.

Looking to the prosecution history, the Court also finds no such disclaimer. Instead, the Inventors' words make clear that the formula is exemplary as the foam "may" be made in such a way, and that "other and different methods" are known in the art which may be used as well. JA00046. As Xodus put it, "MDI and TDI are only two possible isocyanates that may be combined with a polyol to form a viscoelastic foam." Pls. Resp. at 41. Additionally, no other formulation is disclaimed to overcome the prior art as Surgitech contends. Instead, as Xodus points out, Pl. Suppl. Br. at 5, the Inventors' remarks distinguish the prior art by way of the foam's behavior rather than the composition:

> Tursi . . . does not disclose a deformable material configured to have a depression formed therein, which depression "provides a substantial portion of the holding forces which hold a patient generally in a desired position on said pad . . . .

Joint App'x at JA00499; *see also id.* at JA02752 ("[t]here is no teaching in . . . Tursi [prior art] that the viscoelasticity of the viscoelastic foam would help to retain a patient on a tilted medical procedure table."). The composition is never exclusively linked to the claimed behavior used to overcome the prior art. The Inventors state that the exemplary composition is one of many know in the industry that may be used to achieve the desired results.

Despite this, Surgitech pivots its argument to state that term "deformable material" would be indefinite because the claimed behavior associated with the material, such as the "rate of recovery sufficiently slow" and "provide a holding force," provide no meaningful limitation. Def. Supp. Br. at 7–8. Surgitech then proposes that construing the term to include a specific composition would cure the term of indefiniteness and provide boundaries that the term requires. *Id*. Surgitech, however, provides no further justification as to how such a problem would be remedied if the term were to be deemed indefinite. Furthermore, the composition of the material is not what is being claimed in the patent, but rather a deformable material that behaves in a certain way under certain conditions. In other words, the point of novelty is not the composition. Thus, Xodus is correct that Surgitech's focus on the composition of the material is misguided.

Therefore, the Court need not consider the extrinsic evidence cited by Surgitech that pertains to the composition of the foam, as the intrinsic evidence makes clear that the behavior of the material is not necessarily linked to a specific composition. Any attempt to read such compositional limitations into the claim would be at odds with the intrinsic evidence and claim construction procedure. Thus, the second part of the proposed construction fails to find support.

Last, the Court assesses Surgitech's construction of "viscoelastic pad." This construction, however, was entirely dependent on how "deformable material" would be construed. *See* Def. Br. at 11. Since the Court rejected Surgitech's construction of

"deformable material," its proposed construction of "viscoelastic pad" finds no support and is thus rejected.

The Court construes both "deformable material" and "viscoelastic pad" in accordance with their plain and ordinary meaning.

### B. Term 2: "TORSO" / "BODY" ['314 Patent Claims 1, 2 and 23; '876 Patent Claims 1, 2, 13, 19 and 23]

| Xodus Proposed Construction | Surgitech Proposed Construction |
| --- | --- |
| "Torso" – Plain and ordinary meaning.<br><br>"Body" – Plain and ordinary meaning. | "Torso" – "the trunk of the patient which does not include the arms, legs, buttocks or head."<br><br>"Body" – "the whole physical structure of a person including arms, legs, neck and head." |

Surgitech argues that the "torso" claim element, as used in the Xodus' patents, should be construed to mean "the trunk of the patient which does not include the arms, legs, buttocks or head." Def. Br. at 11. Surgitech points to language from the Patents-in-Suit that discusses the term in relation to the other parts of the patient's body. *Id*. at 12. For example, the claims recite that "the head of the patient is displaced lower than the torso of the patient." *Id*. (quoting Joint App'x at JA00050). Surgitech contends that the thighs and shoulders of the patient are described in the claim as distinctly different from the torso. *Id*. at 12 (quoting Joint App'x at JA00050, JA00080 ("[S]aid pad having a length sufficient to extend from about at least the ***thighs*** of a patent to about at least the ***shoulders*** of the patient to support the ***torso*** of a patient placed on the pad.") (emphases in Defendant's brief)); Def. Reply at 8.

Surgitech also attempts to derive support for its proposed construction from the Inventors' and Examiner's words in the prosecution history. Def. Br. at 12–13; Def. Reply 9. Surgitech reads a disclaimer into the Examiner's allowance when the body of a patient was described as comprising of thighs, shoulders, a torso, and a head. Def. Br. at 12–13 (citing Joint App'x at JA00772). Turning to the Inventors' statements made during the prosecution, Surgitech asserts that "torso" is further distinguished from the legs, arms etc. when the Inventors state that "[t]he operating table or a portion thereof is then inclined such that the head and upper torso of the patient is at a vertically lower position than the pelvic region and/or legs



FIG. 6

of the patient, as shown, for example, in Figure 6." *Id.* at 13 (citing Joint App'x at JA00101). Surgitech additionally cites the following excerpt to support its contention as torso is described separately from the head:

> [T]ilting said medical procedure table at an angle, and thus positioning the torso of said patient at an angle with respect to the horizontal, such that the body of said patient is disposed in one of the positions . . . the head of the patient is disposed lower than the torso of the patient, or b) the head of the patient is disposed higher than the torso of the patient.

*Id.* at 13–14 (quoting Joint App'x at JA00476, JA00123–130). Surgitech also relies on this excerpt in support of its proposed construction of "body," as Surgitech contends that the expert shows that the Inventors intended "torso" and "body" to have different

meanings, specifically arguing that the term "torso" is used as a limiting term, whereas the term "body" is used in a manner which encompasses all components of the body such as the head, arms, legs, and torso. *Id.*; Def. Reply 12.

Last, Surgitech maintains that Xodus is attempting to escape the bounds of such limitations by improperly relying on the "weasel word" "comprising" when construing the terms, arguing that the use of the transition word does not abrogate claim limitation. Def. Reply at 9 (citing *Spectrum Int'l.*, 164 F.3d at 1380).

Xodus counters that the meaning of "torso" and "body" are readily apparent and need not be construed. Pls. Resp. at 18. A layperson, submit Xodus, would easily understand both terms, and Surgitech cannot point to a special definition of the terms within the intrinsic evidence, thus they should be granted their plain and ordinary meanings. *Id.* (citing *Phillips*, 415 F.3d at 1314). Furthermore, Xodus, turning to the dictionary definition of each term, notes that "torso," contrary to Surgitech's suggestion, does not exclude buttocks from the definition; nor does the dictionary definition of "body" track with Surgitech's proposed construction. *Id.* (citing 41-2, Exh. B (Merriam-Webster defines "torso" as "the human body apart from the head, neck, arms, and legs : the human trunk . . . ."); 41-3, Exh. C (Merriam-Webster definition of "body")).

Xodus asserts that Surgitech attempts to impute negative limitations into the claim, but to do so, such negative limitations must be supported by the specification, which is not the case here. Pls. Resp. at 18 (citing *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1060 (Fed. Cir. 2009) (negative limitations must find support in the specification)). Moreover, Xodus points to the diagrams in Figures 6 and 7 of the specification to contradict Surgitech's construction, as these figures show that the arm and/or buttocks of a patient may be in contact with and supported by the pad. *Id.* (citing Joint App'x at JA00007–08). Surgitech insists that by citing the



FIG. 7

words of the Inventors and the Examiner, it is not importing negative limitations, but rather such limitations are consistent with the intrinsic evidence and the dictionary definition that Xodus cites. Def. Reply at 9.

Surgitech essentially seeks to have certain parts of a patient's anatomy expressly excluded from the construction of the term "torso" and to have other parts expressly included in construction of the term "body." The Court determines whether such express constructions are warranted over a lay reading. The Federal Circuit has held that negative limitations must find support either in "the words of the claim" or through an "express disclaimer or independent lexicography in the written

description that would justify adding that negative limitation." *Ethicon LLC v. Intuitive Surgical, Inc.*, 847 F. App'x 901, 907–08 (Fed. Cir. 2021) (citing *Omega Eng'g*, 334 F.3d at 1323). In the case of the term "torso," Surgitech cannot make the case that "arms, legs, buttocks [and] head" have all been explicitly disclaimed by the Inventors.

While it is true that arms, legs, and head have all been described separately from the torso throughout the Patents-in-Suit and in the prosecution history, the same cannot be said of "buttocks." Surgitech does not explain why "buttocks" should be excluded from the term. A generous reading of Surgitech's brief is that, to justify its exclusion of "buttocks," Surgitech cites to the Inventors' statements that describe "the pelvic region" in relation to the "upper torso" of the patient. Def. Br. at 13. However, this does not warrant the express exclusion of "buttocks" from the construction of "torso." Not only does it not rise to the level of express disclaimer needed, but the Inventors' statements also only describe "the pelvic region" in relation to the "upper torso," allowing a case to be made that the pelvic region could be a part of the lower torso. Furthermore, Xodus is correct in pointing out that, "contrary to [Surgitech's] position that 'torso' excludes the buttocks, Figs. 6 and 7 of the Patents-in-Suit show a patient's buttocks on a pad." Def. Supp. Br. at 6 (citing Joint App'x at JA00036–37). The Court agrees and finds that Surgitech fails to make the case that buttocks should be excluded from the construction of "torso."

This leaves the Court to contend with Surgitech's argument in favor of the exclusion of "arms, legs, . . . [and] head" from the construction of "torso." "[I]n some

cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314 (internal citations omitted). With only arms, legs, and head left in Surgitech's proposed construction, the need to construe the term becomes unnecessary, as the proposed construction without "buttocks" is consistent with a lay reading of the term. Xodus points to a dictionary definition that defines "torso" as "the human body *except for the head, arms, and legs*." Pls. Resp. at 18 (citing R. 41-2, Exh. B). Thus, torso is afforded its plain and ordinary meaning.

Turning to the term "body," Surgitech fails to point to anywhere in the patent or the prosecution history that supports its construction of the term "body." Instead, Surgitech proposes that the bounds of the transition phrase "comprising" that modifies the term "body" should be limited, such that Surgitech's proposed construction is justified. Def. Reply 9. (citing *Spectrum Int'l.*, 164 F.3d at 1380). In *Spectrum Int'l*, the Federal Circuit determined that the use of the transition word "comprising" did not allow plaintiff to recapture the claim scope where it was relinquished during examination to overcome prior art. 164 F.3d at 1380. Surgitech's reliance on *Spectrum Int'l* to narrow the bounds of the transition word "comprising" is misguided. The court in *Spectrum Int'l* narrowed the bounds of the term due to the explicit disclaimer on the part of the inventors during prosecution to overcome the prior art. *Id*. Here, the Inventors made no such disclaimer. The term "body" was not

explicitly defined or narrowed by the Inventors during prosecution to overcome any prior art. Thus, Surgitech's reliance on *Spectrum Int'l* to narrow the scope of the term's construction fails and "body" should be afforded its plain and ordinary meaning.

The Court construes both "torso" and "body" in accordance with their plain and ordinary meaning.

### C. Term 3: "EXTENDED FROM AT LEAST THE THIGHS" ['314 Patent Claims 1 and 23; '876 Patent Claims 1 and 17]

| Xodus Proposed Construction | Surgitech Proposed Construction |
|---|---|
| "Extend from **about** at least the thighs" – Plain and ordinary meaning. | "Extended from at least the thighs" – "the pad must cover at least a portion of the thighs of a patient." |

Next, Surgitech contends that the claim term "extended from at least the thighs" must mean "the pad must cover at least a portion of the thighs of a patient." Def. Br. at 14. Surgitech relies on the following excerpts from the specification to support its construction:

> said pad having a length sufficient to extend from about the thighs of a patent to about the shoulders of a patient to support the torso of a patient placed on said pad.
>
> . . .
>
> According to at least one possible embodiment, the viscoelastic foam pad can be of varying lengths, and can extend form either the feet, lower legs, thighs, or buttocks of a patient to either the shoulders, head, or top of the head of a patient.

*Id.* (quoting Joint App'x at JA00050, JA00043); Def. Reply at 10. Surgitech does not put much stock into the term "about" and argues that a boundary point is established

at the "thighs" of the patient to the "shoulders" of the patient. Def. Br. at 15; Def. Reply at 10. Confusingly, Surgitech takes the above excerpts to mean that the pad must be covering the patient. Def. Br. at 14–17. The patient, as Xodus is quick to correct, is not covered by anything, but rather placed on top of the pad. Pls. Resp. at 20; Pls. Supp. Br. at 6–7.

In addition to claiming support in the specification, Surgitech once again argues that the prosecution history disclaims scope to support its construction. Def. Br. at 22–23; Def. Reply at 10–11. The prior art that the Inventors overcame claimed a pad that extended over the lower back of the patient. *Id*. Surgitech points out that the Inventors overcame the prior art by clarifying that the invention in the prior art "certainly would not extend from about at least the thighs of a patient to about at least the shoulders of a patient." Def. Br. at 16 (quoting Joint App'x at JA00498). This, however, as noted by Xodus, is just a simple reiteration of the claim language and is not indicative of disclaimer. Pls. Resp. at 20.

Accordingly, Surgitech's proposed construction finds support in neither the specification nor the prosecution history. Surgitech cites multiple excerpts from both the specification and the prosecution history where the boundaries of the viscoelastic pad are discussed. But these excerpts seem to be at odds with Surgitech's own construction. Def. Br. at 14–17 (citing Joint App'x at JA00050, JA0043, JA00459, JA00498). Xodus correctly points out that neither the Patents-in-Suit nor the Inventors' statements during prosecution indicate or suggest that the pad covers anything. Pls. Resp. at 20; Pls. Supp. Br. at 6–7. Thus, the Court rejects Surgitech's

31

proposed construction, and turns its inquiry to the question of the pad's boundary point.

The definitive boundary seems to remain in question despite the Court's rejection of Surgitech's proposed construction. The issue is where on the lower body the boundary point of the viscoelastic pad begins. Surgitech argues that the definitive boundary for the pad is at the thigh, while Xodus emphasizes the role of "about" as a term of approximation in support of a more flexible interpretation. When looking at the claim language, however, the meaning is readily apparent. As the court in *Phillips* states, words of a claim are generally given their ordinary and customary meaning as interpreted by a POSITA within the context of the entire patent. *Phillips*, 415 F.3d at 1312–13. *Phillips* explains that "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. Such is the case here. Xodus contends that a lay reading of the term supports its position that the term should be afforded its plain and ordinary meaning, and that Surgitech's argument that the distinguishing statements of the Inventors are not at odds with the plain and ordinary meaning. Pls. Supp. Br. at 7–8. A lay reading of the claim language "from about at least the thighs" to mean "***about*** where the thighs begin" is consistent with the figures included in the specification:



FIG. 4

FIG. 5

FIG. 6

FIG. 7

Joint App'x at JA00005–08, '720 patent, FIG. 4–7; JA00034–37, '314 patent, FIG. 4–7; JA00064–67, '876 patent, FIG. 4–7. In other words, where the top of the thigh meets the buttocks, is in fact, "about where the thigh begins."

33

Surgitech's proposed construction lacks support in the specification and the prosecution history and is thus rejected. Furthermore, a lay reading of the term is consistent with how the term is used in the specification. Therefore, the term should be afforded its plain and ordinary meaning.

### D. Term 4: "COEFFICIENT OF STATIC FRICTION" / "HOLDING FORCES" ['314 Patent Claims 16, 23, 17 and 18; '720 Patent Claims 1, 8 and 12; '876 Patent Claims 1, 3, 17 and 18]

| Xodus Proposed Construction | Surgitech Proposed Construction |
|---|---|
| "Coefficient of static friction" – Plain and ordinary meaning.<br><br>"Holding forces" – Plain and ordinary meaning. | "Coefficient of static friction" – "frictional force between two or more objects measured by the tangent of the angle at which the object slide. The nominal perpendicular force onto the pad from the body of the patient and component of the force of gravity on the patient parallel to the surface of the operating table at forty-five degrees are equal, which means that the equivalent total frictional characteristic will be equal to or greater than the normal, perpendicular force. For an angle of forty-five degrees, the equivalent total frictional characteristic which is one. Stated more generally, the equivalent total frictional characteristic would be greater than the sine of the angle of inclination from the horizontal over the cosine of the angle of inclination from the horizontal."<br><br>"Holding forces" – "the amount of measurable energy that creates a contact force without the use of straps or other restraints." |

### 1. Coefficient of Static Friction

Surgitech asks the Court to construe the "coefficient of static friction" as "frictional force between two or more objects measured by the tangent of the angle at which the object slide. The nominal perpendicular force onto the pad from the body of the patient and component of the force of gravity on the patient parallel to the surface of the operating table at forty-five degrees are equal, which means that the equivalent total frictional characteristic will be equal to or greater than the normal, perpendicular force. For an angle of forty-five degrees, the equivalent total frictional characteristic which is one. Stated more generally, the equivalent total frictional characteristic would be greater than the sine of the angle of inclination from the horizontal over the cosine of the angle of inclination from the horizontal." Def. Br. at 17–18. Surgitech begins by proposing that, given the scientific nature of the term "coefficient of static friction," the Court should construe the term in a manner that would assist a trier-of-fact in understanding the meaning. *Id*. at 18. Surgitech relies on the Federal Circuit's reasoning in *Sulzer Textile A.G. v. Picanol N.V.*, in which the court indicates a need for district courts to provide a jury with instructions that ensure that the jury fully understands the court's claim construction rulings. *Id*. (citing *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004)). Xodus responds that this standard is incorrect, and even if it was correct, Surgitech's proposed construction includes an incorrect trigonometric equation and would not

assist the trier-of-fact in understanding the meaning of the term. Pls. Resp. at 21–22; Pls. Supp. Br. at 8.

In the specification, Surgitech identifies a passage from which it derives its construction of the term.

> The holding quality or ability between the Trendelenburg Pad and a patient will be a combination of the coefficient of friction between the patient and the viscoelastic foam and the holding ability of the impression made by the patient in the Viscoelastic foam, because the Trendelenburg pad is made of a viscoelastic foam in which an impression is formed and held in the foam at least for a time after the patient is moved from one position to another or from the operating table (see FIG. 5). The equivalent total frictional characteristic, which includes the friction due to the coefficient of friction and the friction or friction-like force due to the viscoelastic foam deformation, may be equal to or in excess of one. **That is to say, the normal, perpendicular force onto the viscoelastic pad from the body of the patient and component of the force of gravity on the patient parallel to the Surface of the operating table at forty-five degrees are equal, which means that the equivalent total frictional characteristic will be equal to or greater than the normal, perpendicular force. For an angle of forty-five degrees, the equivalent total frictional characteristic is one, which is sin 45°/cos 45°. Stated more generally, the equivalent total frictional characteristic would be greater than the sine of the angle of inclination from the horizontal over the cosine of the angle of inclination from the horizontal.**

Def. Br. at 18 (quoting Joint App'x at JA00044 (emphasis in Defendant's brief)). Surgitech maintains that Figure 11 supports its construction, as, according to Surgitech, it provides a visual representation of the "coefficient of static friction" along with a calculation to determine the value of the "coefficient of static friction" when the surgical pad and table are positioned at a 45% angle.



## FIG. 11

Def. Br. at 19 (citing Joint App'x at JA00041). Surgitech also cites to language from the specification:

> FIG. 11 is a representation of a table inclined at a forty-five degree angle. W is the weight of a patient. The normal force perpendicular to the surface of the operating table is 0.707 W. The force along the table is 0.707 W. The equivalent coefficient of friction including the actual coefficient of friction and holding ability of the Trendelenburg pad and the fasteners 130 of the present application to hold a patient is 1.00.

*Id.* (quoting Joint App'x at JA00045). In the prosecution history, Surgitech cites to the Inventors' words, which Surgitech argues provides a definition to the "coefficient of static friction."

> That is to say, the normal, perpendicular force onto the viscoelastic pad from the body of the patient and component of the force of gravity on the patient parallel to the surface of the operating table at forty-five degrees are equal, which means that the equivalent total frictional characteristic will be equal to or greater than the normal, perpendicular force. For an angle of forty-five degrees, the equivalent total frictional characteristic is one, which is [sin45°/cos45°]. Stated more generally, the equivalent total frictional characteristic would be greater than the sine of the angle of inclination from the horizontal over the cosine of the angle of inclination from the horizontal.

*Id.* at 19–20 (quoting Joint App'x at JA00625, JA00379).

Xodus counters that the passage from the specification, the calculation associated with FIG. 11, and the excerpt of the Inventors' words during prosecution, describe only a "frictional characteristic," which includes forces other than those due to the "coefficient of static friction" thus rendering any definition or calculation incorrect. Pls. Supp. Br. at 8.

Xodus offers the opinion of its expert, DePhillipo, to provide clarity as to the meaning of the term.

> [T]he coefficient of static friction is the ratio of the maximum static friction force between two surfaces before one body begins to slide across another body, as long as no other forces are holding the bodies in place.

Pls. Resp. at 22 (quoting DePhillipo Decl. ¶ 39); *see also* Pls. Supp. Br. at 8–9. Surgitech, in Reply, takes issue with Xodus' reliance on the expert's testimony and declares that if anything can be gleaned from the expert's construction, is that the "ratio" to which the expert refers is the "mathematical formula" presented by the Inventors and included in Surgitech's proposed construction. Def. Reply at 11–12.

As an initial matter, Surgitech is incorrect that claims must be construed in a manner in which a lay jury can understand. This misstatement appears to be based on a mistaken application of case law in which the Surgitech asserts that the "plain and ordinary meaning" of the term should be interpreted from the perspective of a lay person rather than a POSITA. The plain and ordinary meaning of a term, however, is the meaning that the term would have to POSITA at the time of the invention. *Phillips*, 415 F.3d at 1312–13. Surgitech fails to explain why its proposed

construction should be adopted over the plain and ordinary meaning of the term to better inform a POSITA, as Xodus points out. Instead, Surgitech attempts to justify its position by citing *Sulzer Textil A.G. v. Picanol N.V.* and ultimately confuses a jury instruction standard for a claim construction standard. 358 F.3d 1356. The Court, however, adheres to the established POSITA standard as instructed in *Phillips* in construing terms and we now turn to the terms at issue.

The Court first determines whether Surgitech's construction of "coefficient of static friction" finds support in the specification. The Federal Circuit in *Phillips* recognized that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. . . . In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness*, 288 F.3d at 1366; *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001)). Upon review of the specification for each patent, it is clear that the "coefficient of static" friction is never expressly defined. *See* Joint App'x at JA00013–24, JA00042–52, JA00072–82. The instances in which the term is specifically used is when a value range is defined in relation to the coefficient of static friction and its effect on the interactions of the pad and the surface upon which the pad rests. *Id*. As Xodus correctly point out, Surgitech relies on a passage from the specification describing a "frictional characteristic" without explanation to arrive at its proposed construction. Pls. Supp. Br. at 8. Immediately preceding the passage of

the specification to which Surgitech cites as justification for its construction, the specification clearly refers to a "frictional characteristic":

> The equivalent total **frictional characteristic**, which includes the friction due to the coefficient of friction and the friction or friction-like force due to the viscoelastic foam deformation, may be equal to or in excess of one.

Joint App'x at JA00015, JA00044, JA00074 (emphasis added). The cited passage upon which Surgitech relies acts as a clarifier for the preceding passage, which in no way expressly defines the "coefficient of static friction" and discusses other contributory forces as DePhillipo correctly points out. DePhillipo Decl. ¶¶ 37–38. As noted above, Surgitech also argues that the description for Figure 11 contains a calculation for the coefficient of static friction. Def. Br. at 19. Upon reading the description of Figure 11, such a calculation is nowhere to be found. Instead, the description speaks to an "equivalent coefficient of friction," an "actual coefficient of friction," and the "holding ability of the Trendelenburg pad and the fasteners." *Id*.; Joint App'x at JA000045. Surgitech makes no effort to differentiate each term, nor does it attempt to clarify the relationship between these terms and its construction. Therefore, Surgitech is unable to find any conclusive evidence for its construction in the specification.

Surgitech's reliance on the Inventors' words in the prosecution history suffers from the same shortcomings. Surgitech relies again on the same excerpt from the specification regarding "frictional characteristic" to justify its construction; however, in this instance, the excerpt is derived from the Inventors' correspondence with the examiner. Def. Br. at 19–20. This justification fails to convince the Court for the same reason that citing to this excerpt was unconvincing in the Court's analysis of the

specification. Therefore, Surgitech is unable to put forth any conclusive evidence from the prosecution history for its proposed construction.

Given the lack of evidence to support Surgitech's proposed construction for "coefficient of static friction," the Court rejects Surgitech's proposed construction. It adopts the plain and ordinary meaning, which Xodus' expert explains would be understood by a POSITA. DePhillipo Decl. ¶¶ 39–40. Thus, "coefficient of static friction" is afforded its plain and ordinary meaning.

## 2. Holding Forces

Surgitech argues that the claim term "holding forces" as used in the Patents-in-Suit, must be construed to mean "the amount of measurable energy that creates a contact force without the use of straps or other restraints." Def. Br. at 20. Surgitech reasons that its proposed construction makes clear that the holding force is generated by contact between the patient and the pad with no contributions to those forces from straps or other restraining devices. *Id.* Surgitech relies on the claim language, the specification, and the prosecution history in support of its argument.

In the claims of the Patents-in-Suit, the language used implies that the "holding force" is generated substantially by the depression in the pad.

> [W]hich depression [in the pad] provides a substantial portion of the holding forces which hold a patient generally in a desired position on said pad upon the medical procedure table being tilted at an angle . . . .

Def. Br. at 20 (quoting Joint App'x at JA00050). There is no mention of straps or restraints, and it is in this omission from which Surgitech builds its argument. *Id.* In addition, Surgitech points out that the specification describes the "holding quality or

ability" as being made up of a "combination of the coefficient of friction between the patient and the viscoelastic foam and the holding ability of the impression made by the patient in the viscoelastic foam," which also is silent with respect to the use of straps as part of the holding force. *Id.* (quoting Joint App'x at JA00044). Surgitech also relies on the omission of any mention of straps or restraints in the prosecution history, as the Inventors' communications with the Examiner mention that the depression that a patient's torso forms when laying on the pad "provides a substantial portion of the holding forces which hold a patient generally in a desired position." *Id.* at 21 (quoting Joint App'x at JA00472, JA00050–55). Surgitech notes that the Inventors describe a process whereby a measurable amount of energy is needed to create depression in the pad, which results in the holding forces. *Id.*

Surgitech also contends that the Inventors disclaimed straps in their communications with the Examiner. Def. Br. at 21. The Inventors distinguish the invention from the West and Tursi prior art by again pointing to a substantial portion of the holding forces being generated by the depression the torso of a patient forms in the pad. *Id.* The Inventors go on to note that the West prior art utilizes straps, and that the source of the holding forces was the distinguishing feature between the invention and the prior art. *Id.* Therefore, reasons Surgitech, the Inventors intended that the claimed "holding forces" should not be provided by straps, which is captured by Surgitech's proposed construction. *Id.*

Xodus retorts that Surgitech's proposed construction should be rejected for three reasons. First, Surgitech attempts to import an unsupported negative

limitation "in order to conjure a non-infringement." Pls. Resp. at 22. Second, Surgitech's construction also imports the undefined terms "measurable energy" and "contact force," which do not appear anywhere in the written description of the Patents-in-Suit. *Id.* Xodus notes that nothing precludes the use of straps despite these omissions as the depression formed is described as being responsible for a substantial portion of the holding forces, but not all of it. Pls. Resp. at 23 (citing Joint App'x at JA0498–99; DePhillipo Decl. ¶ 45). Third, the transition phrase "comprising" is open ended and does not exclude additional features, such as straps, from the scope of the claim. *Id.* at 22–23.

The Court begins with the claim language. As discussed above, Surgitech argues that how the term is used in the claims supports its construction such that the inclusion of the negative limitations is warranted. The claim to which Surgitech cites states that the depression in the pad "provides a ***substantial*** portion of the holding forces." Joint App'x at JA00050 (emphasis added). This language does not provide an adequate basis to conclude that negative limitations are warranted. Surgitech ignores the modification of the term by the word substantial. Xodus correctly point out that by indicating that only a "substantial portion" of the holding forces is provided by the depression, the assistance of straps or other restraints are not immediately precluded by the claim language. Pls. Resp. at 23. Without adequate support for Surgitech's proposed construction in the language of the claims, the Court turns to the specification.

Surgitech contends that the specification supports its construction. As stated above, the Federal Circuit in *Phillips* has recognized that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. . . . In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Phillips*, 415 F.3d at 1316 (citations omitted). Also as previously stated, for a construction to properly include a "negative limitation" or express exclusion of a particular element, the Federal Circuit has held that such exclusions must find support either in the words of the claim, through an express disclaimer, or from independent lexicography in the written description that would justify adding that negative limitation. *Ethicon*, 847 F. App'x at 907–08. Surgitech argues that the specification defines "holding forces" to be "a combination of the coefficient of friction between the patient and the viscoelastic foam and the holding ability of the impression made by the patient in the viscoelastic foam." Def. Br. at 20 (quoting Joint App'x at JA00044). Thus, Surgitech reasons, the specification disclaims the possible inclusion of the straps or other restraints. *Id.* at 20–21. Reading the context of the cited passage paints a different picture, however. First, the cited excerpt refers to "[t]he holding ***quality*** or ***ability***," not the holding *forces* as Defendant contends. Joint App'x at JA00044 (emphasis added). Second, Surgitech make no effort to explain why a POSITA would equate "holding quality" to "holding forces." Finally, even if the Court were to accept such an equivalence, other references to holding quality or holding ability are at odds with

Surgitech's assertion that the specification disclaims the use of straps or other restraints. Within the same passage cited by Surgitech, the specification states:

> The holding capabilities are a combination of the holding ability of the pad, the **body straps**, and the coefficient of friction of the pad with respect to the patient and the table, between the pad and the sheet between the pad and the patient, and between the sheet and the patient, for all described angles.

*Id*. (emphasis added). "Body straps" are mentioned throughout the specification. *See* Joint App'x at JA00013–24, JA00042–52, JA00072–82. Given the mention of body straps throughout the specification of each of the Patents-in-Suit and no express disclaimer, Surgitech's proposed construction does not find support within the specification.

Next, the Court turns to the prosecution history to determine whether straps and other restraints have been disclaimed by the Inventors' statements. Surgitech's reliance on the prosecution suffers partly from the same shortcomings that it relied upon in analyzing the specification and the claim language. First, Surgitech cites to a statement from the Inventors in which they fail again to account for the phrase "substantial portion." Def. Br. at 21. As the Court determined above, reliance on this language does not provide an adequate basis to conclude that negative limitations are warranted and that the assistance of straps or other restraints are not expressly precluded by the claim language. Surgitech, however, digs deeper into the history, claiming that the Inventors overcame the Examiner's rejection by distinguishing the invention at issue from the prior art by pointing out that the holding forces in the prior art were provided by straps while the invention at issue lacked them. *Id*. This, however, is an incorrect characterization of the Inventors' statements. The distinction

made over the prior art was not that the holding forces in the invention at issue did not include straps at all, but rather that the depression in the pad provides "a substantial portion" of the holding forces" where the prior art did not. Pls. Supp. Br. at 9.

Finally, Surgitech cites to a statement from the Inventors in which they state that "the broadest reasonable interpretation of claim 1 might encompass a pad including other materials, such as high density or low density foams in addition to the recited deformable material." Def. Reply at 13 (quoting Joint App'x at JA02749). While this may seem to provide greater support for Surgitech's claim of disclaimer, immediately following the cited statement, the Inventors go on to say that "[t]he patient support apparatus as a whole might include additional structures." Joint App'x at JA02749. Although the Inventors do list specifically list "straps" as an "additional structure," Surgitech cites to nothing else in the prosecution history that would preclude those "additional structures" from including straps, such that they would be expressly disclaimed and relies only on a cropped quote for support. Thus, Surgitech's construction does not find support that the prosecution history expressly disclaims the use of straps from contributing to the holding forces.

Given the lack of evidence to support Surgitech's proposed construction for "holding forces," Surgitech's construction is rejected. Thus, the term "holding forces" is afforded its plain and ordinary meaning.

### E. Term 5: "PAD" / "PAD ARRANGEMENT" ['314 Patent Claims 1, 2, 3, 13, 17, 18, 23 and 26; '720 Patent Claims 1, 4, 6, 8, 10 and 12; '876 Patent Claims 1, 3, 4, 17, 18, 19 and 20]

| Xodus Proposed Construction | Surgitech Proposed Construction |
|---|---|
| "Pad" / "Pad arrangement" – Plain and ordinary meaning. | "Pad" / "Pad arrangement" – "one uniform piece of material in a rectangular shape which does not include arm accessories." |

Surgitech claims support for its proposed construction that "pad" and "pad arrangement" must mean "one uniform piece of material in a rectangular shape which does not include arm accessories" in the specification and the prosecution history. Def. Br. at 22.

The specification discusses the rectangular shape of the pad and does not mention any arm attachments in association with the pad: "a single-use, viscoelastic Trendelenburg pad comprising *a rectangular shape* and viscoelastic polyurethane." Def. Br. at 22 (quoting Joint App'x at JA00046). Similarly, Surgitech points out that the prosecution history also omitted any mention of arm accessories in relation to the pad. *Id.* Surgitech focuses on the mention of the rectangular shape of the pad in the specification and the omission of arm attachments to support its proposed construction. *Id.* Xodus, however, asserts that using such an omission to support Surgitech's construction inserts an unsupported negative limitation. Pls. Resp. at 24. Surgitech then turns to the drawings to support its construction as the pad is shown to be rectangular and without arm accessories, citing *CYI/BETA Ventures v. Tura LP* to highlight the importance of the drawings in construing claims. Def. Supp. Br. at 12 (citing 112 F.3d 1146, 1153 (Fed. Cir. 1997)).

The Court must first determine whether Surgitech's attempt to narrow the construction of "pad" and "pad arrangement" to only being "rectangular" in shape is proper. The "pad" being described as "rectangular" appears in the claims of the '720 patent such that it would be redundant to read the shape into the term. Joint App'x at JA00021–22; *see U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction "is not an obligatory exercise in redundancy"). In the '314 and '876 patents, on the other hand, the "pad" being described as "rectangular" appears only in the specification as an embodiment, and not in the claims. Joint App'x at JA00045–46, JA00075–76. Reading limitations from the specification into the patent is typically avoided "[e]ven when the specification describes only a single embodiment." *Hill-Rom Servs.*, 755 F.3d at 1372 (cleaned up). The patentee must demonstrate a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction if a limitation from an embodiment is to be read into the claim. *Id.* Surgitech cites no such expression of manifest exclusion. Thus, construing the "pad" and "pad arrangement" to only be rectangular in shape is redundant in the case of the '720 patent and improper as it pertains to the '341 and '876 patents.

The Court next determines whether Surgitech's importation of the negative limitation "which does not include arm accessories" is proper. As stated throughout this Opinion, the Federal Circuit has held that negative limitations must find support either in "the words of the claim" or through an "express disclaimer or independent lexicography in the written description that would justify adding that negative

limitation." *Ethicon*, 847 F. App'x at 907–08. Surgitech cites multiple instances in both the prosecution history and the specification in which a "pad" is mentioned without the addition of the "arm accessories" in dispute. Def. Br. at 22. The law is clear in that an express disclaimer is needed for such an importation to be proper. *See Ethicon*, 847 F. App'x at 907–08. Surgitech fails to demonstrate how the arm accessories are expressly disclaimed and relies only on passive omissions to make its case. Surgitech's reliance on the figures, which show a rectangular pad, does not change the analysis. As stated above, Surgitech relies on *CVI/BETA Ventures* to argue that "[t]he patent drawings are highly relevant in construing the . . . limitations of the claims." Def. Supp. Br. at 12 (quoting 112 F.3d at 1153). That principle may be true, but the court in *CVI/BETA Ventures* did not read in omissions into its construction that were not expressly disclaimed, as Surgitech is asking the Court to do here. 112 F.3d at 1153–60.

The Court next addresses whether Surgitech's proposition that the bounds of the transition phrase "comprising" should be limited, such that Surgitech's proposed construction would be justified. Surgitech relies on *Spectrum Int'l*. in support of its argument, but for the same reasons discussed above regarding the term "body," the Court finds that Surgitech's reliance on *Spectrum Int'l* unavailing. Def. Reply at 13 (citing 164 F.3d at 1380). As discussed above, in *Spectrum Int'l*, the court determined that the use of the transition word "comprising" did not allow plaintiff to the recapture claim scope where it was relinquished during examination to overcome prior art. *Id*. Again, as with the term "body," Surgitech's reliance on *Spectrum Int'l*

49

fails because the court in *Spectrum Int'l* narrowed the bounds of the term due to the inventors' *explicit* disclaimer during prosecution to overcome the prior art. *Id.* Here, the Inventors made no such disclaimer. The terms "pad" and "pad arrangement" were not explicitly narrowed by the Inventors during prosecution to overcome any prior art.

Surgitech's reliance on omission to read negative limitations into the claim fails and is not saved by its attack on the scope of the transition term "comprising." Additionally, Surgitech's attempt to import the limitation "rectangular" from the specification into the claim language also fails, as there was no expressions of manifest exclusion or restriction related to the term that warrant such a reading. Thus, the Court construes the terms "pad" and "pad arrangement" in accordance with their plain and ordinary meaning.

### F. Term 6: "BALL REBOUND" ['314 patent claims 17 and 18]

| Xodus Proposed Construction | Surgitech Proposed Construction |
|---|---|
| "Ball rebound" – Plain and ordinary meaning. | "Ball rebound" – "the distance a metal ball will bounce after impacting the surface. It is measured by the ball-rebound test (ASTM D3574). In this test, a steel ball is dropped off from a certain height on the material and the rebound is then measured in percentage compared to the predetermined height." |

Finally, Surgitech asks the Court to construe the term "ball rebound" to mean "the distance a metal ball will bounce after impacting the surface. It is measured by the ball-rebound test (ASTM D3574). In this test, a steel ball is dropped off from a certain height on the material and the rebound is then measured in percentage

compared to the predetermined height." Def. Br. at 23. Surgitech supports its proposed construction by reading into the claim language meaning extrinsic to the patent and file history, in hopes of again aiding a lay person in understanding the term. *Id*. Surgitech cites industry standard and calls into question the Inventors' statements during prosecution to further support its proposed construction. *Id*. Surgitech argues that the Inventors distinguished the West prior art on the basis that West failed to disclose a ball rebound value and cite to the remarks of the Inventors.

> West does not disclose pad comprises a rebound, such as ball rebound, sufficiently small to minimize undesirable movement of a patient during a medical procedure, said ball rebound is in a range of approximately 0.1 percent to approximately 5 percent, a range of approximately 0.1 percent to approximately 1.9 percent.

*Id*. (quoting Joint App'x at JA00460).

Xodus responds, as an initial mater, that while Surgitech references the ball rebound test, ASTM D3574, it to fails to produce the test. Pls. Resp. at 24–25. Next, Xodus contends that the industry standard to which Surgitech cites is in and of itself evidence that a POSITA would understand the plain and ordinary meaning of the term under the correct standard. Pls. Supp. Br. at 10. Xodus cites DePhillipo's declaration to further underline the contention that a POSITA would understand the term as is and that Surgitech's construction does not actually incorporate the industry standard test to which it cites. Pls. Resp. at 25 (citing DePhillipo Decl. ¶¶ 55–59).

51

Surgitech incorrectly reasons that no plain and ordinary meaning of the term ball rebound exists. This is couched in what seems again to be a mistaken application of law in which Surgitech asserts that the "plain and ordinary meaning" of the term should be interpreted from the perspective of a lay person rather than a POSITA. Def. Br. at 23. As stated previously, the plain and ordinary meaning of a term, however, is the meaning that the term would have to a POSITA at the time of the invention. *Phillips*, 415 F.3d at 1312–13. As Xodus points out, Surgitech fails to argue that its proposed construction should be adopted over the plain and ordinary meaning of the term, to better inform a POSITA. Instead, Surgitech attempts to argue that its proposed construction better informs the trier of fact or lay person.[8] Def. Br. at 23. In view of the correct standard, Surgitech's argument seems to run contrary to its position that construction is necessary, as its argument suggests that the term would indeed be readily understood by a POSITA. Pls. Resp. at 25; Pls. Supp. Br. at 10.

Notably, Surgitech admits that the ball rebound test is understood as an industry standard and puts forth in Exhibit G a real-world example of a ball rebound testing device. R. 39-7, Exh. G. Neither of these contradict the idea that a POSITA would not understand the plain and ordinary meaning of the term. In fact, they seem to support Xodus' argument that a POSITA would understand the term. Surgitech's attempt to rebut this position is contradicted by its own Exhibit G. Surgitech posits rhetorical questions meant to highlight uncertainties regarding the test, such as "what size balls should be used?" and "How high should they be dropped?" Def. Reply

---

[8]Such arguments are more appropriately raised when preparing for trial, rather than at the claim construction stage.

at 17. These questions, however, are readily answered within its own Exhibit G. R. 39-7, Exh. G (describing the test as using "a 16-mm magnetic steel ball" that "falls freely onto the sample from a specified height of 500mm."). DePhillipo states that a POSITA would understand to apply ASTM D3574—which Surgitech states is depicted in Exhibit G, Def. Supp. Br. at 10–11—and that explicitly reciting the use of ASTM D3574 would be redundant, DePhillipo Decl. ¶¶ 55–56. Surgitech points to no evidence contradicting DePhillipo's position.

Last, Surgitech's assertion that its construction is supported because the Inventors distinguished the West prior art from the invention at issue is unfounded. Surgitech's attempt at ascribing an explicit definition to the term is not necessitated by the Inventors distinguishing the invention over the West prior art on the basis that West did not disclose a ball rebound value. Def. Br. at 23. Surgitech offers no compelling reason to persuade that this is necessitated. Thus, the Court finds this reasoning uncompelling.

Surgitech incorrectly reads the claim from the perspective of a layperson as opposed to a POSITA and does not provide support for its construction from either the intrinsic evidence or the extrinsic evidence. Therefore, the Court construes the term "ball rebound" according to its plain and ordinary meaning.

## III.    Conclusion

In sum, the Court construes the disputed terms as follows:

| Disputed Term | Construction |
|---|---|
| Term 1: "DEFORMABLE MATERIAL" / "VISCOELASTIC PAD" ['314 Patent Claims 1, 3, 17, 18, 23 and 24; '876 Patent Claims 1, 3, 17 and 18; '720 Patent Claims 1, 6, 8, 10 and 12] | Plain and ordinary meaning |
| Term 2: "TORSO" / "BODY" ['314 Patent Claims 1, 2 and 23; '876 Patent Claims 1, 2, 13, 19 and 23] | Plain and ordinary meaning |
| Term 3: "EXTENDED FROM AT LEAST THE THIGHS" ['314 Patent Claims 1 and 23; '876 Patent Claims 1 and 17] | Plain and ordinary meaning |
| Term 4: "COEFFICIENT OF STATIC FRICTION" / "HOLDING FORCES" ['314 Patent Claims 16, 23, 17 and 18; '720 Patent Claims 1, 8 and 12; '876 Patent Claims 1, 3, 17 and 18] | Plain and ordinary meaning |
| Term 5: "PAD" / "PAD ARRANGEMENT" ['314 Patent Claims 1, 2, 3, 13, 17, 18, 23 and 26; '720 Patent Claims 1, 4, 6, 8, 10 and 12; '876 Patent Claims 1, 3, 4, 17, 18, 19 and 20] | Plain and ordinary meaning |
| Term 6: "BALL REBOUND" ['314 patent claims 17 and 18] | Plain and ordinary meaning |

Date: July 20, 2023

United States District Judge
Franklin U. Valderrama