**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

XODUS MEDICAL, INC., ALESSIO
PIGAZZI and GLENN KEILAR,

      Plaintiffs,

v.

U.S. SURGITECH, INC.,

      Defendant.

No. 1:19-cv-03164
Judge Franklin U. Valderrama

## ORDER

This is a patent infringement case in which Plaintiffs Xodus Medical, Inc.,
Alessio Pigazzi, and Glenn Keilar (collectively, Xodus), the assignees of U.S. Patent
Nos. 8,464,720, 8,511,314, and 9,161,876 (the Patents-in-Suit), allege that Defendant
U.S. Surgitech, Inc., (Surgitech) has infringed their Patents-in-Suit, which involve
viscoelastic foam pads to prevent slippage on tables during medical procedures. R.
24, First Amended Complaint (FAC) ¶¶ 20–28.[1] Before the Court is Xodus's Motion
for Summary Judgement on Surgitech's defenses that the Patents-in-Suit are invalid
under the on-sale bar of 35 U.S.C. § 102(b) or as indefinite pursuant to 35 U.S.C.
§ 112. R. 101, Pls.' Mot. Summ. J. For the reasons that follow, the motion is granted.

---

[1]Citations to the docket are indicated by "R" followed by the docket number and, where
necessary, a page or paragraph citation.

### Background[2]

On January 12, 2009, inventor Dr. Alessio Pigazzi purchased 155 viscoelastic foam pads from UFP Technologies (UFP), a foam manufacturer where co-inventor Glenn Keilar had worked. PSOF ¶¶ 21–23; Def.'s Resp. PSOF ¶¶ 21–23. The UFP invoice, dated January 12, 2009, listed a quantity of 155 pads at a unit price of $19.96 (totaling $3,093.80), with delivery to Dr. Pigazzi at City of Hope hospital. PSOF ¶ 25; DSOAF ¶ 1. Dr. Pigazzi paid this invoice personally, and UFP shipped the pads to him at City of Hope hospital where he worked. PSOF ¶¶ 24, 25. It is undisputed that this transaction occurred more than one year before Xodus filed its patent applications – in fact, about three years prior to the filing date. DSOAF ¶ 1. At the time, Dr. Pigazzi had no commercial partner or customer for these pads and no avenue to market them. PSOF ¶ 29. The 155-pad quantity far exceeded Dr. Pigazzi's immediate need and represented the minimum order size UFP required for a custom production run. *Id.* ¶ 26. Dr. Pigazzi did not disclose to UFP the specific purpose or intended use of the pads he ordered. *Id.* ¶ 27. Moreover, he did not sell or offer these pads to any third party, nor were the pads used on patients before the critical date; indeed, Dr. Pigazzi could not use them in surgery at that time because they lacked necessary hospital approvals. *Id.* ¶¶ 28–30. It was only years later, after the patent applications were filed, that Xodus entered a licensing arrangement and the pads

---

[2]This factual background is taken from the parties' Rule 56.1 statements of facts and responses, including Plaintiffs' Statement of Facts (R. 103, PSOF); Defendant's Response to Plaintiffs' Statement of Facts (R. 107 at 1–34, Def.'s Resp. PSOF); Defendant's Statement of Additional Facts (R. 107 at 34–49, DSOAF); and Plaintiffs' Response to Defendant's Statement of Additional Material Facts (R. 119, Pls.' Resp. DSOAF).

(marketed as Xodus's "Pink Pad") were commercially released in 2012, at a significantly higher retail price per pad than the nominal unit price reflected in the 2009 UFP invoice. PSOF ¶ 69; *see also* R. 107-10 at PageID 8753.

Xodus sued Surgitech for patent infringement involving three patents directed to viscoelastic foam patient positioning pads: U.S. Patent Nos. 8,464,720; 8,511,314; and 9,161,876 (the Patents-in-Suit). Pls.' Mot. Summ. J. at 1. The Patents-in-Suit disclose devices and methods for securing patients on tilted surgical tables (such as the steep Trendelenburg position) using a viscoelastic foam pad to prevent slippage. PSOF ¶¶ 57–65. Surgitech in turn has asserted the defenses that the patents are invalid due to the on-sale bar or alternatively are invalid for indefiniteness.

Xodus seeks summary judgment arguing that the Patents-in-Suit are not invalid under either the on-sale bar of 35 U.S.C. § 102(b) or indefinite under 35 U.S.C. § 112. Pls.' Mot. Summ. J. at 1. The fully briefed motion is before the Court.

**Legal Standard**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Federal Circuit applies the law of the regional circuit to a motion for summary judgment. *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1313 (Fed. Cir. 2016). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460

3

(7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008).

If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

Patent invalidity must be proven by clear and convincing evidence. *Tec Air, Inc v. Denso Mafg. Michigan Inc.,* 192 F.3d 1353, 1358 (Fed. Cir. 1999). "Clear and convincing evidence has been described as evidence which proves in the mind of the trier of fact an abiding conviction that the truth of the factual contentions are highly probable." *Intel Corp. V. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed. Cir. 1991) (cleaned up). Here, this means that the burden is on Surgitech to prove by clear and convincing evidence that the Patents-in-Suit are invalid.[3] *See Innovative SCUBA Concepts, Inc., v. Feder Indus. Inc.*, 26 F.3d 1112, 1115 (Fed. Cir. 1999).

---

[3]Given that Xodus's summary judgment is before the Court, at this stage, Surgitech must simply create a question of fact as to whether there is clear and convincing evidence that the Patents-in-Suit are invalid.

It is important to note at the outset that the Court recently granted in part Xodus's *Daubert* motion to exclude Surgitech's expert witness Dr. Alzoubi's testimony. R. 122, *Daubert* Order. In that Order, the Court specifically excluded Dr. Alzoubi's opinions on indefiniteness and on-sale bar, finding that his methodologies were unreliable and based on incorrect legal standards. *Id.* at 31. Accordingly, in deciding the present motion, the Court gives no weight to Dr. Alzoubi's excluded opinions on those issues. The summary judgment record is instead evaluated based on the admissible evidence (including the parties' Statements of Material Facts and the intrinsic patent record) and the governing law, without reliance on Dr. Alzoubi's conclusions.

As stated above, Xodus argues that it is entitled to summary judgment on Surgitech's defenses that the patents are invalid under the on-sale bar of 35 U.S.C. § 102(b) or indefinite under 35 U.S.C. § 112. The Court addresses each argument in turn, starting with the on-sale bar.

## Analysis

### I.    On-Sale Bar

A U.S. patent application cannot be filed more than one year from the date a product or service embodying the invention was first offered for sale or sold. 35 U.S.C. § 102(b). The on-sale bar exists primarily to prevent an inventor from exploiting the commercial value of an invention while intentionally delaying the beginning of the patent term. *See Pfaff v. Wells Electronics, Inc.* 525 U.S. 55, 68 (1998). The one-year date before the application's filing is the critical date. *Id.* at 57. The on-sale bar's one-

year clock begins to run when a product is "subject of a commercial offer for sale" and "ready for patenting." *Id.* at 67.

In *Pfaff*, the Supreme Court established a two-part test for the on-sale bar: it applies if, before the critical date, (1) the invention was the subject of a commercial offer for sale, and (2) the invention was ready for patenting. 525 U.S. at 67. The first prong, that the invention be the "subject of a commercial offer for sale," is assessed under general commercial law principles (for example, looking to whether there was an offer to sell that could be legally accepted to form a contract) and examines whether the transaction bears the hallmark of a sale of the invention *per se* as opposed to merely an experimental or preparatory activity. *See The Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1373 (Fed. Cir. 2016) (*en banc*) ("*Hospira I*"). Importantly, the on-sale bar is not triggered by every sale—it is aimed at preventing an inventor from commercially exploiting the invention beyond the statutory one-year grace period before filing, while still allowing the inventor to engage in purely experimental use or other pre-commercial activity without starting the clock. *See id.* The second prong, ready for patenting, may be satisfied by proof that the invention was reduced to practice before the critical date or that the inventor had prepared enabling descriptions or drawings sufficient to allow a person skilled in the art to practice the invention. *Pfaff*, 525 U.S. at 67–68. Whether the on-sale bar applies is a question of law based on underlying facts. *Hospira I*, 827 F.3d at 1371.

### A. Commercial Offer for Sale

"[T]o define whether a communication or series of communications rises to the level of a commercial offer for sale," the Federal Circuit has, "[a]s a general proposition, . . . look[ed] to the Uniform Commercial Code ('UCC')." *Hospira I*, 827 F.3d at 1373 (cleaned up). The UCC "describes a 'sale' as 'the passing of title from the seller to the buyer for a price.'" *Id.* at 1375 (quoting U.C.C. § 2-106(1)). The Federal Circuit has also declined, however, "to draw a bright line rule making the passage of title dispositive." *Id.* at 1376. Courts also consider, *inter alia*, the following factors: the absence or presence of confidentiality obligations, the commercial quantities and pricing of the goods, and the relationship between the parties (e.g., inventor vs. third-party customer, or inventor vs. supplier). *See id.* at 1375–76.

Xodus moves for summary judgment, arguing that the January 2009 UFP transaction does not render the asserted claims invalid under the on-sale bar. R. 102, Pls.' Memo. Summ. J. at 2–13. According to Xodus, Surgitech cannot show by clear and convincing evidence that the 2009 UFP invoice was a commercial sale or offer for sale of the patented pads. *Id.* at 5–8. Instead, the foam pads "were samples made by UFP at the request of Dr. Pigazzi as part of his pre-commercialization efforts, and were never used, sold, or offered for sale by the inventors (or anyone else) prior to the critical date." *Id.* at 5. From Xodus's perspective, the use of a contract manufacturer to develop sample products that are never marketed or sold are not invalidating commercial sales. *Id.* at 6. Xodus relies heavily on *Hospira I*, 827 F.3d 1363 and

7

*Dorman Products, Inc. v. PACCAR, Inc.*, 201 F. Supp. 3d 663 (E.D. Pa. 2016) in support of that proposition.

In *Hospira I*, the patentee (Medicines Co.) hired a contract manufacturer to produce batches of a pharmaceutical drug before the critical date, paying the manufacturer for that service. 827 F.3d at 1366. The supplier manufactured several "commercial size" batches of the patented drug and supplied them to the patentee. *Id.* at 1366. The parties also entered into a contract for weekly batches of the drug. *Id.* at 1367. The central issue was whether the patentee's contract with the supplier to manufacture the material embodying the patented invention triggered the on-sale bar. The *en banc* court concluded that the transactions did not give rise to the on-sale bar because, although the product changed hands for value, the record showed the patentee was effectively stockpiling inventory rather than commercially exploiting the invention. *Id.* at 1373–74. The court emphasized that "[s]tockpiling is merely a type of preparation for *future* commercial sales." *Id.* at 1378 (emphasis in original). Key factors were that the batches were made to the patentee's specifications for the patentee's own use, under confidentiality, with no transfer of title in a way that put the product in the hands of the public, and that the patentee did not resell or market the product until later. *Id.* at 1375–76.

The Federal Circuit explained that there is no blanket "supplier exception," but the fact that a transaction is between an inventor and a supplier (rather than an inventor and a customer) is a strong indicator that it may not be a commercial sale in the intended sense. *Hospira I*, 827 F.3d at 1380. The *Hospira I* court emphasized

8

that what matters is whether the transaction "commercially exploited" the invention. *Id.* at 1369. A "pre-commercial investment" or "pre-commercial preparations" by the inventor, even if it involves a payment to a third party, is not the kind of activity § 102(b) aims to foreclose. *Id.* at 1378–79. The Federal Circuit analogized the patentee's use of a contract manufacturer to a company using its own "in-house manufacturing" facilities – either way, the product is being prepared for future sale, not sold in a manner that makes it available to the public or indicates the inventor has commercialized the invention. *Id.* at 1378. In short, the Federal Circuit concluded that this was not a commercial offer for sale because the supplier lacked the ability to sell the patented drug to third-parties and the manufacturing contract was confidential.

On remand, the Federal Circuit emphasized that not every confidential, pre-launch arrangement escapes § 102(b). *Medicines Company v. Hospira, Inc.*, 881 F.3d 1347, 1352–53 (Fed. Cir. 2018) ("*Hospira II*"). It held that a separate distribution agreement (not the contract manufacturing arrangement at issue in the *en banc* decision) constituted a commercial offer for sale where the agreement contained hallmarks of a product sale, including express "desire" to sell and purchase, a commercial price list, a purchase schedule, and passage of title to the distributor. *Id.* at 1351, 1353.

In *Dorman*, the defendant, PACCAR, filed a counterclaim asserting claims for infringement of certain patents. On cross-motions for summary judgement, the plaintiff-counter defendant, Dorman, moved for summary judgment, arguing that the

9

patents were invalid under the 35 U.S.C § 102(b) because they were the subject of a commercial offer for sale more than one year prior to their respective filing dates. 201 F. Supp. 3d at 674. Specifically, Dorman argued that PACCAR requested and received price quotes from its vendors for producing headlights that are the commercial embodiments of the patented designs. *Id.* at 675. PACCAR, in its cross-motion for summary judgment argued that the on-sale bar defense failed as a matter of law because the quotes from plaintiff's vendor were not commercial sales. *Id.* The court agreed with PACCAR. Relying on *Hospira I*, the court found that there was no commercial offer for sale because it was a transaction between a patentee and a supplier and the patentee retained control of the invention during the transaction. *Id.* at 677. Dorman, observed the court, did not dispute that the quotation from the supplier was a confidential offer and that the plaintiff retained title to the headlights. *Id.* It therefore denied Dorman's motion and granted PACCAR's cross-motion as to Dorman's affirmative defense of invalidity based on the on-sale bar. *Id.* at 678.

This case, insists Xodus, is similar to *Hospira I* and *Dorman*, for several reasons. First, it involves a transaction "between the patentee and a supplier for the purpose of manufacturing products for a patentee who otherwise lacked manufacturing capabilities." Pls.' Memo. Summ. J. at 8. Second, the transaction between Dr. Pigazzi and UFP was confidential in nature. *Id.* at 9. Third, when Dr. Pigazzi acquired the sample foam pads, he had no commercial outlet for the pads. *Id.* Fourth, the unit price that Dr. Pigazzi paid UFP for the sample foam pads was far

10

less than the average price for the licensed Xodus Pink Pads sold by Xodus when they entered the market. *Id*. at 9–10.

Predictably, Surgitech disagrees. Surgitech argues that *Hospira I* is distinguishable because in that case the invention was not sold and no property changed hands. R. 106, Def.'s Resp. at 2. The way Surgitech sees it, the inventor always owned the property and retained title to the property. *Id*. Not so here. Surgitech contends that the January 2009 UFP transaction was a commercial sale of the claimed invention before the critical date and thus renders the patents invalid under the on-sale bar. Def.'s Resp. at 3–8. More on point, argues Surgitech is *Hospira II*. In that case, like in this case, the transaction covered the actual sale of the product. *Id*. at 3. According to Surgitech, the UFP transaction was a commercial transaction with the exchange of money for goods (the pads) with title being transferred. *Id*. Surgitech maintains that "no supplier exception exists to the on-sale bar." *Id*. (citing *Special Devices, Inc., v. OEA, Inc.*, 270 F.3d 1353, 1357 (Fed. Cir. 2001)). Surgitech urges the Court not to follow *Dorman* because that court disregarded precedent. *Id*. Instead, submits Surgitech, the Court should follow *Hamilton Beach Brands, Inc. v. Sunbeam*, 726 F.3d 1370 (Fed. Cir. 2013); *Brassler, U.S.A. I, L.P. v. Stryker Sales Corp.* 182 F.3d 888, 889 (Fed. Cir. 1999) and *Special Devices*, 270 F.3d at 1355. The Court finds that Xodus has the better of the argument.

For starters, Surgitech's reliance on *Hospira II* is misplaced because that case involved an exclusive distribution agreement that, on its face and in operation, was designed to commercially market product through a distributor and therefore bore

"the hallmarks" of a commercial offer for sale (including commercial pricing, an ordering framework, and transfer of title for downstream distribution). *Hospira II,* 881 F.3d at 1352. Here, by contrast, the only pre-critical date transaction is a January 12, 2009 invoice for a minimum-quantity run of 155 pads that Dr. Pigazzi requested from a supplier and paid for personally, with shipment to his office. Pls.' Memo. Summ. J. at 3; *see also* R. 118, Pls.' Reply at 3. There is no evidence that UFP sold or offered those pads to anyone else. Pls.' Memo. Summ. J. at 3–4. Critically, the purpose and intended use of the pads was not disclosed to UFP, and Dr. Pigazzi could not use the pads in the operating room because they were not approved for that use. *Id.* The record further supports that Dr. Pigazzi, not UFP, controlled any public dissemination or commercialization and did not commercialize the invention until after the critical date. *Id.* at 8. On these facts, *Hospira II*'s distribution-agreement analysis does not carry Surgitech's burden because the UFP transaction lacks the commercially exploitative features that mattered in *Hospira II*, and instead fits the supplier-to-inventor, pre-commercialization context that the *en banc Hospira I* framework treats as noncommercial for § 102(b) purposes.

Surgitech's reliance on *Hamilton Beach Brands, Inc.*, *Brassler, U.S.A. I, L.P.* and *Special Devices, Inc.* also misses the mark. In *Hamiton Beach*, as the *Hospira I* court noted, the patentee did not argue that a supplier exception applied or that no commercial sale of the patented product would occur if the inventor purchased it from a supplier. *Hospira I*, 827 F.3d at 1380 (citing *Hamilton Beach*, 726 F.3d at 1375). In *Brassler*, again as noted by the court in *Hospira I*, the transaction there was

indisputably one in which the rights in the patented invention passed between the parties for consideration. *Id.* at 1379 (citing *Brassler,* 182 F.3d at 890–91). In *Special Devices*, the Federal Circuit rejected any "supplier exception" to the on-sale bar, holding that it "does not matter who places the invention 'on sale'"—a sale by or to the inventor can trigger § 102(b) just as a sale to a customer would; that is, there is no "safe harbor" for sales to one's supplier or from one's supplier. 270 F.3d at 1355. Notably, in *Special Devices*, the inventor conceded that the transaction with the supplier was a commercial sale. *Id.* at 1357. *Hospira I* makes clear that UCC-style sale formalities are not dispositive under *Pfaff*; the relevant inquiry is whether the transaction reflects commercial marketing of the invention rather than preparation for potential or eventual marketing. *Hospira I*, 827 F.3d at 1376–77.

*Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161 (Fed. Cir. 2022), cited by Surgitech, is likewise distinguishable. In *Sunoco*, the inventor's company offered to *sell and install* an allegedly patented butane-blending system for a customer in exchange for the customer's commitment to purchase butane over time—a clear commercial offer of the patented method and system to a third-party end user. *Id.* at 1169. The Federal Circuit held that offer was an invalidating offer for sale because it "bears all the hallmarks of a contract for sale," including specified price terms and obligations, even though the transaction had some unique structure. *Id.* at 1170 (cleaned up). Here, none of the *Sunoco* facts are present: no offer to an end-user, no incorporation of the invention into a commercial contract with a customer. There is only an internal transfer between inventor and manufacturer.

13

In short, Surgitech's cited authorities underscore the point that if an inventor uses a supplier transaction to quietly commercialize the invention, the on-sale bar applies (as in *Brassler*, *Special Devices*, *Sunoco*). But where, as here, the inventor's supplier transaction is merely to obtain experimental or preparation materials without any contemporaneous market redistribution, the on-sale bar does may not apply (as in *Hospira I* and *Dorman*). This case fits squarely in the latter category.

Surgitech also invokes *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 586 U.S. 123, 130 (2019) for the proposition that an invalidating sale need not publicly disclose the invention. That statement of law is correct: under the America Invents Act, a commercial sale to a third party can place an invention "on sale" even where key terms or proprietary details are subject to confidentiality. *Id.* But *Helsinn* involved a patentee's commercial supply and distribution arrangement with a marketing partner, the type of agreement designed to commercialize product through the marketplace. *Id.* at 126. Here, by contrast, the record reveals that the January 12, 2009 UFP transaction was an inventor's procurement of sample pads from a foam manufacturer, where the intended use was not disclosed to UFP, there is no evidence UFP provided the pads to anyone other than Dr. Pigazzi, and Dr. Pigazzi had no commercial outlet at the time. Moreover, Dr. Pigazzi did not use the pads in the operating room (and could not, given lack of approval) and did not test them in the 2009 timeframe. On these facts, *Helsinn* does not support Surgitech's on-sale bar theory because the dispute here is not whether publicity is required, but whether this transaction was commercial exploitation of the claimed invention at all.

It is undisputed that Dr. Pigazzi's January 2009 purchase of 155 pads from UFP involved a formal invoice, a transfer of title to the pads, and payment of a price per unit. PSOF ¶ 23; DSOAF ¶ 1. In other words, the transaction had the formal attributes of a sale under commercial law, but that is not dispositive of whether it was a commercial offer for sale under *Pfaff*. *See Hospira I*, 827 F.3d at 1376. UFP agreed to manufacture and deliver the pads, and Dr. Pigazzi (through his company OR Medica) agreed to pay for them. PSOF ¶ 23. While the form of the transaction in this case (a purchase order and invoice for a quantity of pads, shipped F.O.B. to the buyer at an agreed price) bears the hallmarks of a commercial sales contract, the Court's analysis cannot stop at the form alone. The Federal Circuit's *en banc* decision in *Hospira I* instructs that courts must look deeper into the substance and context of the transaction to determine whether it constitutes "commercial marketing of the invention, not preparation for potential or eventual marketing." 827 F.3d at 1377. The Court now undertakes that analysis.

**Inventor-Supplier Relationship:** The 2009 transaction was between the inventors and their foam supplier, not between the inventors and any end-user customer or distributor. PSOF ¶¶ 21–22; DSOF ¶ 21; DSOAF ¶ 1. As in *Hospira I* and *Dorman,* the inventor, here, Dr. Pigazzi, lacked manufacturing capabilities for the foam pads and turned to a supplier (UFP) to make pads to his specification. PSOF ¶ 21. This kind of supplier-inventor transaction "is an important indicator that the transaction is not a commercial sale." *Hospira I*, 827 F.3d at 1376, 1380. Surgitech emphasizes *Special Devices'* statement that no formal "supplier exception" exists

15

(Def.'s Resp. at 3), and that is true—there is no *per se* rule. *Special Devices*, 270 F.3d at 1357. But *Special Devices* predates the Federal Circuit's *en banc* clarification in *Hospira I*. The import of *Hospira I* is that while a supplier sale can trigger the bar, courts must examine if the supplier commercially sold the invention or was merely performing "manufacturing services" for the inventor. *Hospira I*, 827 F.3d at 1377. Here, UFP was making a custom batch of pads solely for the inventor's own use, and there is no evidence UFP ever marketed or sold these pads to anyone else. PSOF ¶ 28. In substance, UFP acted as a contract manufacturer for Dr. Pigazzi, not as a seller into the marketplace. This weighs against finding a commercial sale.

**Confidentiality and Control:** Admittedly, there is no nondisclosure agreement in the record. But Dr. Pigazzi did not disclose the purpose or details of the pad invention to UFP beyond what was needed to fabricate the pads (PSOF ¶ 27), and neither party publicized the transaction. There is no evidence that anyone beyond UFP and Dr. Pigazzi knew of or had access to the pads before the critical date. PSOF ¶ 28. In *Hospira I*, the Federal Circuit noted that the confidential nature of the transactions was a factor weighing against their commercial nature. 827 F.3d at 1376. The same is true here. The entire 155-pad lot went directly to Dr. Pigazzi, and UFP retained no rights to distribute them (PSOF ¶ 28; ¶ 27). There is no evidence in the record that UFP kept any extra pads for itself despite the large batch size. *See* PSOF ¶¶ 25, 28. This indicates that Dr. Pigazzi retained exclusive control over the pads, consistent with an internal prototype order rather than a market release. This weighs against finding a commercial sale.

**No Pre-Critical Date Commercial Exploitation:** It is uncontroverted that Dr. Pigazzi did not sell or offer to sell any pads to anyone before the critical date, nor did he use the pads in any public-setting surgeries. PSOF ¶ 30. The pads remained unused in a clinical sense; Dr. Pigazzi's deposition confirms he could not employ them in actual surgeries at that time because they lacked approval for operating room use. *Id.* Thus, whatever Dr. Pigazzi's long-term intentions, he made no commercial use of the pads in the 2009–2010 timeframe. *Hospira I* teaches that preparations for future marketing (such as building inventory or testing prototypes) do not trigger the bar. 827 F.3d at 1377. Here, the evidence shows at most preparation and positioning for later commercialization, not an attempt to commercially exploit the invention in 2009. In fact, Dr. Pigazzi did not secure a commercial partner (Xodus Medical) or introduce the product to market until *after* filing for the patents. PSOF ¶¶ 34, 69. This gap between the 2009 procurement and the 2012 market release underscores that the 155 pads were part of "pre-commercial investment," not an actual market sale. Pls.' Memo. Summ. J. at 8–9. This weighs against finding a commercial sale.

**Quantity and Pricing Anomalies:** The circumstances of the sale (quantity and price) further suggest a prototype supply scenario rather than a commercial venture. Dr. Pigazzi ordered 155 pads only because UFP imposed a minimum order of that size. PSOF ¶ 26. He "desired far fewer" pads for his immediate needs but had to take 155 to get any made. *Id.*; Pls.' Memo. Summ. J. at 9. In a true commercial sale to meet market demand, one would expect the quantity to reflect the inventor's or seller's projected customer need; here it reflected only the supplier's bulk production

17

requirement. The minimum-order constraint and the record evidence regarding inventory point the same direction. UFP required a 155-unit minimum production run, and the record contains no evidence that UFP retained any pads for resale or otherwise offered the pads to third parties; instead, the entire production run was delivered to Dr. Pigazzi. This supports the conclusion that UFP functioned as a contract manufacturer for the inventor rather than selling the invention into the marketplace. Additionally, the price Dr. Pigazzi paid (about $19.96 per pad) was a nominal manufacturing cost, far below the eventual market price of the finished product. PSOF ¶ 69. When the Pink Pad product launched commercially in 2012, it sold at a significantly higher price point reflecting market value. PSOF ¶ 69 *see also* R. 107-10 at PageID 8753. The Federal Circuit noted in *Hospira I* that a price paid which is far less than "the ultimate market value of the product" can indicate a manufacturing service rather than a true market sale. 827 F.3d at 1375. Here, the price and bulk order suggest Dr. Pigazzi was effectively paying UFP for manufacturing services and materials (to produce custom prototypes), not engaging in an arm's-length market sale at market pricing. This weighs against finding a commercial sale.

Considering all these factors, the Court concludes that Surgitech has not created a question of fact that there exists clear and convincing evidence a "commercial offer for sale" of the invention before the critical date. Rather, the undisputed evidence shows an internal, experimental, or at least pre-commercial character to the UFP transaction. This case, contrary to Surgitech's contention, aligns

18

with *Hospira I* and the likes of *Dorman Products*, where transactions between inventors and their suppliers for prototype or pre-production units were found not to trigger the on-sale bar. It is distinguishable from the cases Surgitech relies upon, such as *Brassler* and *Special Devices*, which involved scenarios where the inventor's supplier transactions were part of an actual commercialization plan already afoot. In *Brassler*, for instance, the inventor had the manufacturer produce goods "for general marketing," and the inventor was actively selling the product himself around that time. 182 F.3d at 891. Here, by contrast, Dr. Pigazzi's pads were not marketed or sold to the public at all prior to filing—they were shelved until he could arrange a formal market launch later. Pls.' Memo. Summ. J. at 11. *Special Devices* rejects any categorical "supplier" exception to § 102(b), and holds that supplier contracts can trigger the bar when they involve a commercial offer for sale and the invention is ready for patenting. But the decision does not eliminate the threshold *Pfaff* inquiries. Where the evidence shows a development-stage arrangement to obtain a limited number of prototype units as part of product development or experimental work, rather than a commercial sale or offer for commercial stockpiling or marketing, § 102(b) is not satisfied on its own terms.

Xodus argues that summary judgment in their favor as to the on-sale bar is additionally warranted as to their method claims, as Surgitech presents no evidence that the 2009 UFP invoice represents a sale or offer to sell the claimed method. Pls.' Memo. Summ. J. at 10. Predictably, Surgitech again disagrees, arguing that the asserted method claims are barred because the pads could be used to practice the

claimed patient-positioning steps, relying on an "embodiment" theory. Def.'s Resp. at 10–11. But for process claims, the on-sale bar ordinarily requires a commercial offer to perform the claimed method or performance of the method for compensation. *See In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002); *Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1162 (Fed. Cir. 2006). Surgitech cites *BASF* and *Scaltech* for the proposition that, in some circumstances, sale of a product embodying the essential features of a claimed process can be tantamount to placing the process on sale. Def.'s Resp. at 11 (citing *BASF Corp. v. SNF Holding Co.*, 955. F.3d 958 (Fed. Cir. 2020); *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321 (Fed. Cir. 2001)). Even crediting Surgitech's contention that UFP received fabrication drawings and label artwork (DSOF ¶ 27), the record contains no evidence that UFP was offered or agreed to perform the claimed patient-positioning steps, and it is undisputed the pads were not used on patients before the critical date. Accordingly, Surgitech has not shown a triable issue that the asserted method claims were the subject of a commercial offer for sale before the critical date.

Surgitech also references other purported transactions (including the PAC Foam Products quotation) as alternative on-sale events. Def.'s Resp. at 12. On this record, however, Surgitech has not presented admissible, claim-specific evidence that any such document constitutes a commercial offer for sale of the claimed invention or that the referenced items meet the asserted claim limitations. Moreover, the record contains testimony undermining the reliability and relevance of the PAC document as evidence of a commercial offer for sale. Pls.' Reply at 6–7. In sum, Surgitech has

not carried its burden to identify evidence creating a genuine dispute of material fact that would preclude summary judgment relating to the on-sale bar for other transactions.

Accordingly, the Court finds as a matter of law that the 2009 UFP transaction was not a "commercial offer for sale" of the patented invention under § 102(b). Instead, it was a confidential, inventor-controlled procurement of prototype pads in furtherance of later commercialization, akin to stockpiling or other pre-commercial preparation which does not invoke the on-sale bar's policy concerns.

### B. Ready for Patenting

Because the Court concludes that Surgitech has not raised a triable issue on the first *Pfaff* prong, the Court need not reach whether the invention was ready for patenting before the critical date. Even assuming the invention was ready for patenting, Surgitech's on-sale bar defense fails because the identified pre-critical-date activities do not constitute commercial offers for sale of the claimed invention under § 102(b). *See Dorman*, 201 F. Supp. 3d at 677.

### C. On-Sale Bar Conclusion

All in all, Surgitech has failed to present evidence from which a reasonable factfinder could conclude, by clear and convincing evidence, that the January 12, 2009 UFP transaction was an invalidating commercial sale of the claimed invention. To the contrary, the record indisputably shows that this transaction was a non-public, inventor-controlled acquisition of prototype pads, below market price, without any market exposure or commercial exploitation of the invention prior to the critical date.

PSOF ¶¶ 26–30. The on-sale bar was designed to prevent inventors from extending their monopoly by exploiting the invention commercially before filing—a scenario not borne out by the facts here. Accordingly, Xodus is entitled to summary judgment on Surgitech's on-sale bar defense.

## II. Indefiniteness

Xodus also moves for summary judgment on Surgitech's defense that certain claim terms are indefinite under § 112. Pls.' Memo. Summ. J. at 13–25. The three phrases at issue are: (1) "rate of recovery sufficiently slow to maintain a depression in said pad for a desired period of time" (the "rate of recovery" limitation); (2) "substantial portion of the holding forces"; and (3) "generally in a desired position." PSOF ¶ 12. These phrases appear in various claims of the Patents-in-Suit, describing functional characteristics of the foam pad and the result achieved when securing a patient. In brief, the claims describe a viscoelastic foam pad that, after being deformed by the patient's weight, recovers its shape slowly enough to keep an impression (depression) in the pad for a time, thereby helping hold the patient in place, and that through friction supplies a substantial portion of the forces holding the patient generally in the desired position on the table.

Section 112 of the Patent Act requires that a patent claim "particularly point out and distinctly claim" the subject matter regarded as the invention. 35 U.S.C. § 112(b). In *Nautilus, Inc. v. Biosig Instruments, Inc.*, the Supreme Court held that a patent claim is invalid for indefiniteness if, when read in light of the specification and prosecution history, the claim fails to inform, with reasonable certainty, those skilled

22

in the art about the scope of the invention. 572 U.S. 898, 901 (2014). This is a question of law for the court, as it involves determining the claim's meaning to a skilled artisan in view of the intrinsic record. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). While underlying factual findings (such as the knowledge of a person of skill in the art) may play a role, indefiniteness is fundamentally an issue of claim construction and is therefore particularly suited for resolution by the court at summary judgment. *See id.* The burden is on the party asserting indefiniteness to prove it by clear and convincing evidence. *Id.*

Notably, the definiteness requirement does not mean that a claim must be absolutely precise or quantified in numeric terms. As the Federal Circuit has explained, "a claim is not indefinite just because it is broad" or uses descriptive terms rather than strict numerical boundaries. Pls.' Reply at 8–9 (quoting *Niazi Licensing Corp. v. St. Jude Medical S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022)). Claims using terms of degree or subjective terms can satisfy § 112 if the patent's specification and the knowledge in the field provide enough guidance to allow a skilled artisan to understand the scope with reasonable certainty. *Niazi Licensing*, 30 F.4th at 1347–49. In other words, the degree of precision required depends on the nature of the subject matter and what would be expected in context: patentees may use qualitative functional language so long as the claims, read in context, delineate the bounds of the invention in a manner that the skilled reader can interpret without undue speculation. *See Miles Lab'ys, Inc. v. Shandon Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993). On the other hand, claims that might mean several different things to a skilled reader

23

and lack any objective standard for choosing among them are indefinite. With these principles in mind, the Court addresses each issue in turn.

Before turning to each disputed phrase, the Court notes again that Dr. Alzoubi's testimony on indefiniteness has been excluded. *Daubert* Order at 31. Thus, Surgitech effectively lacks any expert evidence to support an assertion that these terms would confuse a person of ordinary skill in the art (POSITA). Even if the Court were to consider Dr. Alzoubi's opinions, for the reasons stated in more detail in its *Daubert* Order, it would find them unpersuasive and legally flawed. Dr. Alzoubi applied an overly stringent standard—demanding mathematical exactitude in claim language—that is not the law. Pls.' Memo. Summ. J. at 17–18; *see also Daubert* Order at 15. He also attempted to import specific quantitative thresholds and limitations into the claims (for example, opining that "sufficiently slow" must mean a recovery time greater than 10 seconds, and that without such a numeric cutoff the term is indefinite). Def.'s Resp. at 15–16. The Court agrees with Xodus that this approach improperly conflates indefiniteness with dissatisfaction about breadth, and in effect amounts to a belated attempt at claim construction under the guise of indefiniteness. Pls.' Memo. Summ. J. at 18–21. The law is clear that breadth is not indefiniteness, and an expert may not rewrite claims to add limitations that the patentee did not include. *See Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1373 (Fed. Cir. 2022).

As stated above, the Court's task is to determine whether, viewed in light of the specification and prosecution history and as understood by a POSITA, the claims

inform with "reasonable certainty" the scope of the invention, recognizing that absolute precision is unattainable. *Nautilus*, 572 U.S. at 901. Surgitech's position—presented chiefly through the opinions of its technical expert, Dr.Alzoubi—is that these phrases are purely subjective or lack objective boundaries, and thus fail to inform a person of ordinary skill in the art about the scope of the invention with reasonable certainty. Def.'s Resp. at 12–24.

Xodus argues in its motion for summary judgment that Surgitech applies the wrong standard by demanding precise numerical measurements, whereas the law permits qualitative terms so long as a skilled artisan would understand the claim in light of the intrinsic record. Pls.' Memo. Summ. J. at 16–17; Pls.' Reply at 8–15. Xodus emphasizes that terms like "sufficiently slow" and "substantial portion" are used in context to describe functional characteristics of the invention (e.g., the foam's slow recovery and the frictional holding force), and that a person in the field would readily grasp their meaning when read in light of the specification. Pls.' Memo. Summ. J. at 13–25.

After reviewing the intrinsic record and the parties' arguments, the Court concludes as a matter of law that the terms are not indefinite. Surgitech has not met the demanding clear-and-convincing standard to prove indefiniteness, especially given the exclusion of its expert's opinions. On the contrary, the record shows that a skilled artisan would understand these terms in context, and that Surgitech's indefiniteness position rests on an erroneous insistence for numerical precision where

the law and the patents do not require it. The Court therefore grants Xodus's motion for summary judgment of no invalidity for indefiniteness.

### A. "[R]ate of recovery sufficiently slow to maintain a depression in said pad for a desired period of time"

Xodus first moves for summary judgment on Surgitech's indefiniteness defense as it relates to the following phrase: "rate of recovery sufficiently slow to maintain a depression in said pad for a desired period of time." Pls.' Memo. Summ. J. at 15. This phrase (or a close variant) appears in Claims 1 and 23 of the '314 Patent and in claims 1 and 17 of the '876 Patents, and describes a property of the viscoelastic foam: after being deformed by the patient, the foam recovers its shape slowly enough that an indentation (depression) remains in the pad for some "desired" period. In essence, the foam is like memory foam that doesn't immediately rebound, thereby continuing to cradle the patient.

According to Xodus, the claim language itself is clear enough that even a lay person could understand the plain language of the disputed phrase "to mean that a depression remains visible for some period of time after an object or other depression-generating force is removed." Pls.' Memo. Summ. J. at 16. And the specification provides additional context by providing example rates of recovery, as well as a figure showing an example of a depression maintained on the pad "for a desired period of time upon a change in a depression-generating force on said pad arrangement." *Id.* (quoting PSOF ¶ 64). Xodus contends that Surgitech ignores the intrinsic record in claiming that the phrase is indefinite, and improperly seek to require the claim to contain a numerical time limitation. *Id.* at 16–17. Such a proposition is wrong as a

26

matter of law, posits Xodus. *Id.* at 17–18 (citing *Niazi*, 936 F.3d 1347 ("[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement."). Finally, Xodus argues that Dr. Alzoubi improperly attempts to read the "rate of recovery sufficiently slow" phrase from the claims of the '314 and '876 Patent claims into the '720 Patent's claimed "viscoelastic pad" without relying on any intrinsic or extrinsic evidence. *Id.* at 18–19.

Surgitech, on the other hand, argues that the term "sufficiently slow . . . for a desired period of time" is indefinite because neither the claims nor the specification specify how slow is "sufficiently slow" or how long is a "desired period," leaving potentially any recovery rate covered, with no objective boundary. Def.'s Resp. at 14–15. Surgitech relies on *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 697 (Fed. Cir. 2019), where the Federal Circuit found the term "better drying time" indefinite in a patent claim because it provided no reference point or method to measure "better"; the specification in that case gave inconsistent comparisons, so a POSITA could not determine the scope. Surgitech contends "sufficiently slow . . . desired period" is analogous to "better drying time" or other purely relative terms that have been held indefinite. Def.'s Resp. at 16. Essentially, Surgitech's position is that "sufficiently slow" is a subjective term—sufficiently slow for what, and for how long? Different surgeons might desire different time periods, and the patent provides no single value or threshold. Unlike in *HZNP*, however, here the Court is not presented with a vague term like "better" without context or baseline. That is, "sufficiently slow to maintain a depression . . . for a desired period" is not a

27

comparative term between two different things; it is an absolute (albeit qualitative) requirement tied to an outcome: maintaining a depression for as long as needed. The "desired period" would be understood as whatever duration the user deems necessary to keep the patient stable, which in practice would correlate to the duration of the position change or procedure. That might vary, but variability alone does not equal indefiniteness. The claims here set a functional requirement: the foam's recovery rate must be slow enough to achieve the goal. A POSITA could readily test whether a given foam meets that requirement (for instance, by seeing if the pad retains an imprint during the relevant time of tilting the table). That provides an objective baseline: if the pad loses its depression too quickly (before or immediately upon repositioning), it's not within the claim, whereas if it retains it for the needed interval, it is within the claim.

Surgitech also cites *Datamize* for the proposition that Xodus has not shown "some standard for measuring the scope" of the challenged phrase. Def.'s Resp. at 16 (citing *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005)). Properly understood, however, *Datamize* did not impose a freestanding requirement that the patentee submit extrinsic "evidence" of a standard; rather, the decision turned on the absence of an objective standard in the intrinsic record to cabin a subjective term. 417 F.3d at 1351. The operative question is therefore whether, viewed in light of the specification and prosecution history and as understood by a POSITA, the claim language provides objective boundaries. *See Nautilus*, 572 U.S. at 910 (claims must inform skilled artisans of scope with reasonable certainty). And as

the Federal Circuit has reiterated, claim language, including relative terminology, is construed as a POSITA would understand it "when read in the context of the specification and prosecution history." *Intell. Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1377 (Fed. Cir. 2018) (cleaned up). To the extent Surgitech relies on *Datamize*, the Court considers it only as an example of the broader *Nautilus* principle that purely relative or subjective claim language is indefinite when the intrinsic record fails to supply objective criteria by which scope can be determined.

In fact, Dr. Alzoubi himself admitted in deposition that his opinion of indefiniteness boiled down to the lack of a specific numerical time limit in the claim. For example, when asked, "And in your opinion, because they don't specify a time, that is the reason why they're invalid as being indefinite, correct?" Dr. Alzoubi responded: "That's correct." R. 103-9, Alzoubi Dep. Tr. at 186–87. But the law does not require such numerical precision if the qualitative guidance is adequate. As the Federal Circuit held in *Niazi*, "mathematical precision" is not required, and patentees may use descriptive words to avoid a strict numerical boundary. *Niazi Licensing*, 30 F.4th at 1347.

Surgitech contends that the limitation requiring "a rate of recovery sufficiently slow to maintain a depression in said pad for a desired period of time" is indefinite because "sufficiently slow" and "desired period" allegedly provide no objective boundary. Def.'s Resp. at 16. The Court disagrees. Surgitech's reliance on isolated deposition testimony expressing difficulty stating a single numeric boundary does not establish indefiniteness (Def.'s Resp. at 14), because the inquiry is objective and turns

29

on what a POSITA would understand from the claims and intrinsic record, *Nautilus*, 572 U.S. at 910. Here, the intrinsic record supplies both (i) an objective, time-based meaning for "rate of recovery," and (ii) functional context that cabins what "desired period of time" refers to in operation.

First, the claim language itself is not an untethered statement of preference. Claim 1 of the '314 Patent ties the "desired period of time" to a physical event, requiring that the pad maintain a depression "upon a change in a depression generating force on said pad." PSOF ¶ 36. This language narrows the inquiry to what happens after the load changes (for example, when the patient is moved, repositioned, or the table orientation changes), rather than leaving "desired period" to subjective whim.

Second, Xodus points out that the specification expressly defines what "rate of recovery" is. Pls.' Memo. Summ. J. at 15–16 (citing PSOF ¶ 64). The specification describes the rate of recovery as "the time required for a viscoelastic foam to return to its starting shape." R. 103-1 at 14, '314 Patent at column 2, lines 25–26. That definition gives the term an objective, time-based meaning, and it permits straightforward measurement (how long it takes the foam to rebound toward its original shape after deformation). The specification then provides concrete, quantified examples of recovery time under stated conditions ("placing an adult torso on an approximately one inch thick layer of viscoelastic foam"), including example recovery time bands for partial and complete recovery (50–80% recovery (2–10 seconds), 80–90% recovery (6–15 seconds), and full recovery (10–35 seconds)). PSOF

30

¶ 64; R. 103-1 at 14, '314 Patent at column 2, lines 25–37. Those disclosures supply the POSITA with objective guideposts for what the patent describes as a "slow" recovery in the context of the disclosed embodiments.

Third, the specification explains the functional role of the depression and how long it is intended to persist. In describing the pad's holding performance, the specification teaches that the pad's holding ability is driven not only by friction, but also by the fact that the pad forms an impression that is "formed and held in the foam at least for a time after the patient is moved from one position to another or from the operating table." PSOF ¶ 64; R. 103-1 at 14, '314 Patent at column 5, lines 3–11. FIG. 5 of the '314 Patent, reproduced below, depicts such a depression maintained on the pad.



Read together with the claim's "change in a depression generating force" language, this disclosure provides the operative meaning of "desired period of time." The relevant period is the clinically meaningful time after the loading condition changes, during which the pad is intended to keep the patient stable (including

during repositioning and table movement), rather than immediately rebounding like conventional foam. That is a functional constraint tied to the invention's stated purpose of stabilizing a patient on an inclined table and minimizing sliding.

In summary, the intrinsic record does not leave the POSITA without guidance. It defines the relevant property (recovery rate) in time-based terms, provides example time ranges under specified loading conditions, and links the "desired period" to maintaining an impression after a change in load and patient movement. The Federal Circuit's decision in *Sonix Tech.* is instructive: it upheld a term ("visually negligible") as definite because the patent provided context and examples for what was negligible in the relevant art. *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1381 (Fed. Cir. 2017). Here, similarly, what is "sufficiently slow" is anchored to the needs of maintaining support during patient positioning.

Surgitech's argument largely reduces to the contention that the claim must state a single numerical cutoff to be definite. The law does not impose such a requirement. *Niazi Licensing*, 30 F.4th at 1347. On this record, Surgitech has not shown by clear and convincing evidence that the disputed phrase fails to inform a POSITA, with reasonable certainty, of the scope of the claimed invention. To the extent the disputed language sweeps in multiple recovery-time values, that is an issue of breadth, not indefiniteness, so long as a POSITA can determine whether a particular foam's recovery behavior satisfies the limitation when read in the context of the intrinsic record. *Niazi*, 30 F.4th at 1347.

32

Accordingly, the Court concludes that "rate of recovery sufficiently slow to maintain a depression . . . for a desired period of time" is definite. Surgitech has not shown otherwise by clear and convincing evidence.

And, to the extent that Surgitech invites the Court to construe a viscoelastic foam to have a rate of recovery greater than 10 seconds for complete recovery, the Court agrees with Xodus that Surgitech is attempting to take a second bite at the claim construction apple. Pls.' Reply at 11; *Eazypower Corp. v. Jore Corp.*, 2012 WL 205915, at *2 (N.D. Ill. Jan. 24, 2012) ("[A] matter for claim construction [] is inappropriately brought in this motion for summary judgment" where the party "has had ample time to argue that the patent requires [certain meaning of a term], yet it has failed to do so."). The Court declines to read an additional limitation into the claim.

### B. "[S]ubstantial portion of the holding forces"

Xodus also moves for summary judgment on Surgitech's indefiniteness defense to the phrase, "substantial portion of the holding forces." Pls.' Memo. Summ. J. at 24. Claim 1 of the '314 patent recites the feature of a "depression provid[ing] a substantial portion of the holding forces." PSOF ¶ 36. In addition to claim 1 of the '314 Patent, this phrase also appears in Claim 23 of the '314 Patent and Claim 18 of the '876 Patent, where this phrase describes a substantial portion of the forces holding the patient in place on the table are provided by the viscoelastic pad (as opposed to other means like straps). PSOF ¶¶ 44 and 55.

33

Xodus again contends that the claim language and specification would allow a POSITA to understand that the points at which a patient contacts, and, thus, forms a depression, is where the frictional force between the pad and patient, and the patient and table, are the greatest. Pls.' Memo. Summ. J. at 24. Surgitech's indefiniteness argument, points out Xodus, relies on Dr. Alzoubi's analysis, which fails to acknowledge the intrinsic record. *Id.* at 24–25.

Surgitech, however, maintains that this term is indefinite because the patent does not specify what quantitatively counts as a "substantial" portion—is it 50%? 80%?—nor how to measure "holding forces" in this context. Def.'s Resp. at 20–24. Surgitech again relies on Dr. Alzoubi's (now excluded) view that a POSITA would not know how to determine how much force is due to the pad versus other components, rendering the term "highly subjective." *Id.* at 21. Surgitech argues that, under *Nautilus*, this term of degree is indefinite because the intrinsic record provides no objective boundary for what constitutes a "substantial portion," and no disclosed way to measure or quantify the "holding forces" attributed to the pad. *Id.* at 20–21. The Court disagrees.

As stated above, indefiniteness turns on whether, viewed from the perspective of a POSITA and read in light of the intrinsic record, the claims inform the scope of the invention with reasonable certainty, and indefiniteness must be shown by clear and convincing evidence. *Nautilus*, 572 U.S. at 910; *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010).

34

Here, the Court agrees with Xodus that the claim language itself supplies functional context for what "holding forces" refers to and what the "substantial portion" requirement is doing. For example, Claim 1 of the '876 Patent claims tie "holding forces" to the forces that "hold a patient generally in a desired position on [the] pad arrangement upon the medical procedure table being tilted at an angle," and require that the depression formed by the patient's torso provide a "substantial portion" of those holding forces. PSOF ¶ 46. The Patents-in-Suit share a specification which further anchors the concept. For example, col. 5, lines 3–11 of the '314 Patent's specification explains that the pad's "holding quality or ability" arises from a combination of (i) "coefficient of friction between the patient and the viscoelastic foam," and (ii) "the holding ability of the impression made by the patient in the viscoelastic foam," and it describes the viscoelastic foam as a material "in which an impression is formed and held in the foam at least for a time" after the patient is moved. R. 103-1 at 16. The Patents-in-Suit also discloses that restraints are not necessarily doing the primary work: it states that "body straps … are optional" because the pad "may provide adequate support," (R. 103-1 at 15, '314 Patent, column 4, lines 60–63) and may in some cases eliminate the need for body straps (R. 103-1 at 16, '314 Patent, column 5, lines 42–45). Consistent with that teaching, the specification expressly notes that "[t]he impression on the Trendelenburg pad may provide the primary holding for holding a person on the operating table depending on the angle of the patient." R. 103-1 at 16, '314 Patent, column 5, lines 50–53. Read together, this intrinsic guidance delineates an objective boundary: the "substantial

35

portion" requirement excludes embodiments where the depression's contribution to holding the patient on the tilted table is merely trivial or incidental, while encompassing embodiments where the depression (the "impression") is a significant contributor and, depending on conditions, may even supply the primary holding.

Surgitech's argument again largely reduces to a demand for numerical apportionment (for example, Newtons, pounds, or a specified percentage). But the Court previously rejected Surgitech's attempt to read a "measurable energy" requirement into "holding forces" at claim construction. R. 65, Claim Construction Order at 41–43. And the record confirms that Surgitech's expert's indefiniteness view rests on precisely that kind of numerical-precision demand: Dr. Alzoubi testified that he deemed the claims indefinite because the holding forces could not be "quantif[ied]," and that, to "fix" the supposed indefiniteness, he would want "some numbers" and a way to "put a number" on the force (e.g., Newtons or pounds). Alzoubi Dep. Tr. at 228–29. Yet he also conceded that a POSITA could determine whether "a substantial portion" of the holding force is coming from the pad by a straightforward functional test: placing a patient on the pad, tilting the table without other restraints, and observing whether the patient slides. Alzoubi Dep. Tr. at 231–32. That concession reinforces that the limitation is operationally testable and objectively bounded in the context the claims require (tilted-table positioning), even if it does not specify a single numerical cutoff.

Finally, the Federal Circuit has made clear (as the parties cite) that the law does not require "mathematical precision" in claim language where the intrinsic

context provides qualitative guidance sufficient for a POSITA to determine whether a given embodiment falls within the claim scope. *Niazi Licensing Corp. v. St. Jude Med. S.C.*, Inc., 30 F.4th 1339, 1347 (Fed. Cir. 2022).

On this record, Surgitech has not presented evidence that could carry its clear-and-convincing burden to show that "a depression provides a substantial portion of the holding forces" fails to inform a POSITA, with reasonable certainty, of the scope of the claimed invention.

### C. "[G]enerally in a desired position"

Last, Xodus moves for summary judgment on Surgitech's invalidity defense based on the phrase "generally in a desired position" being indefinite. Pls.' Memo. Summ. J. at 19. The phrase appears in the Patents-in-Suit in the context of holding a patient on a tilted medical procedure table. For example, Claim 17 of the '876 Patent recites "holding a patient generally in a desired position on said pad arrangement on said tilted medical procedure table," and further specifies the kinds of "desired" tilted-table orientations involved (including head-lower-than-torso, head-higher-than-torso, right-side-higher-than-left, left-side-higher-than-right, and combinations thereof). PSOF ¶ 54. Related claims tie this "generally in a desired position" outcome to the pad's functional characteristics on a tilted table, including the pad's frictional and depression-related holding contributions. *See, e.g.*, PSOF ¶ 55; DSOF ¶¶ 36, 38.

Similar to the above terms, Xodus again contends that summary judgment must be entered on Surgitech's indefiniteness arguments related to the phrase "generally in a desired position" because Dr. Alzoubi and Surgitech again engage in

improper claim construction to manufacture an indefiniteness position by requiring an unrecited claim limitation without any unambiguous disclaimer in the intrinsic record, improperly require mathematical precision, and ignore the intrinsic record. Pls.' Memo. Summ. J. at 20–23.

Surgitech responds that its indefiniteness defense should survive Xodus's summary judgment motion because the patents do not provide a POSITA objective boundaries for what it means to hold a patient "generally in a desired position." Def.'s Resp. at 23–24. Surgitech further argues that the phrase necessarily hinges on a "coefficient of static friction" requirement and contends that the Patents-in-Suit allegedly use that concept "broadly" without disclosing measurement parameters, rendering the claims indefinite. *Id.*; DSOAF ¶ 37. Surgitech maintains that a claim can be indefinite if it fails to indicate which measure applies and the intrinsic record does not supply adequate meaning. *Id.* at 23–24 (citing *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344–45 (Fed. Cir. 2015)). The Court disagrees.

It bears repeating yet again that indefiniteness is assessed from the perspective of a POSITA reading the claims in light of the intrinsic record, and the question under the aforementioned *Nautilus* standard is whether the claims inform the scope of the invention with "reasonable certainty." Surgitech bears the burden to prove indefiniteness by clear and convincing evidence. And, as noted above, Dr. Alzoubi's expert opinions on indefiniteness are excluded. *Daubert* Order at 31.

First, the claim language itself provides concrete functional and situational context for "desired position." Claim 17 of the '876 Patent ties "desired position" to

38

holding the patient on "said tilted medical procedure table" and enumerates representative tilt orientations that define the intended positioning context. PSOF ¶ 54. In other words, "desired position" is not an untethered subjective preference; it refers to the intended patient position on the tilted table for the surgical setting described in the claims. That context narrows what "desired" means in operation and provides an objective reference point for a POSITA evaluating whether a patient is being held generally where intended during a specified category of tilted-table procedures. *Id.*

Second, the shared specification of the Patents-in-Suit reinforces that the "desired position" concept is tied to "minimizing sliding, shifting, or similar undesirable movements of the patient on the Support table, which movements could be disruptive to a medical procedure being performed on the patient." R. 103-1 at 14, '314 Patent, column 1, line 65 through column 2, line 5. This intrinsic guidance supplies a practical boundary: the patient is held "generally in a desired position" when the pad's properties keep the patient from sliding or shifting in a manner that defeats the intended tilted-table positioning.

Third, Surgitech's attempt to make defineteness of the phrase rise or fall on a standalone "coefficient of static friction" parameter does not track the claim structure. The claims reflect that "coefficient of static friction" is an additional limitation in certain dependent claims, not a universal requirement embedded in the phrase "generally in a desired position." *See, e.g.*, PSOF ¶ 38 (Dependent Claim 3 of '314 Patent reciting "coefficient of static friction" in addition to the "generally in a desired

position" language); PSOF ¶ 55 ('876 Patent claim reciting coefficient and depression requirements in addition to the "generally in a desired position" outcome). Under *Phillips*, the presence of dependent claims adding a particular limitation gives rise to a presumption that the limitation is not present in the independent claim. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). Thus, Surgitech's argument that "generally in a desired position" is indefinite because it purportedly requires a specific "coefficient of static friction" is at bottom a claim-scope rewrite, not a showing that the phrase itself lacks reasonable certainty when read in context.

Fourth, even where the patents expressly invoke coefficient of static friction (e.g., Dependent Claims 3 & 15–18 of the '314 Patent and Dependent Claims 3, 9–12 & 18 of the '876 Patent; PSOF ¶¶ 38, 40–43, 47, 50–53 & 55) the intrinsic record does not leave a POSITA guessing how the concept is used. The specification describes coefficient of static friction as being "between the viscoelastic foam and the surface of a support table," and it provides example values and ranges (including "greater than 0.2" and ranges extending up to approximately 1.0). DSOF ¶ 37; R. 103-1 at 14, '314 Patent, column 2, line 58–61. The intrinsic record also contains dependent claims that recite specific coefficient ranges, confirming that the parameter is treated as measurable and bounded within the patents' disclosure. PSOF ¶¶ 41, 43, 51 & 53 and DSOF ¶¶ 41, 43, 51 & 53. For that reason, Surgitech's reliance on *Teva* is unpersuasive: unlike the situation where the intrinsic record fails to indicate which measurement framework governs, here the specification and dependent claims identify the relevant interface and provide bounded ranges.

Finally, the record reflects that even Surgitech's own expert treated coefficient of static friction as a standard, testable concept, including defining it and acknowledging that it can be evaluated in the tilted-table setting by reference to patient weight and the forces tending to move the patient. *See* Alzoubi Dep. Tr. at 211:5–13; 229:6–230:22. That reinforces the point that the patents' use of "generally in a desired position" and related friction concepts is not subjective guesswork, but a functional limitation that a POSITA can evaluate in the context the claims and specification describe.

Accordingly, Surgitech has not demonstrated that it could meet its clear-and-convincing burden to show that "generally in a desired position" fails to inform a POSITA, with reasonable certainty, of the scope of the claimed invention.

## D. Indefiniteness Conclusion

Considering the intrinsic evidence and the lack of any contrary factual showing by Surgitech, the Court holds that the challenged phrases are definite. Each term, viewed through the eyes of a person skilled in the art and in light of the specification, informs that person with reasonable certainty about the scope of the invention. Surgitech has not carried its burden of creating a question of fact that it could prove indefiniteness by clear and convincing evidence. Notably, the exclusion of Dr. Alzoubi's testimony leaves Surgitech with no credible evidence of indefiniteness, and even if his opinions were entertained, the Court would find them unavailing because they apply the wrong standard (demanding numerical precision and importing

limitations). The Court instead credits the intrinsic record and common sense understanding of the terminology in context.

Accordingly, the Court grants summary judgment in favor of Xodus on the Surgitech's § 112 indefiniteness defense. The asserted claims of the Patents-in-Suit are not invalid for indefiniteness.

## Conclusion

For the foregoing reasons, the Court finds that Xodus is entitled to judgment as a matter of law on the two invalidity defenses at issue. Xodus's Motion for Summary Judgment of No Invalidity based on the on-sale bar and indefiniteness [101] is granted. The 2009 UFP transaction does not trigger the on-sale bar under 35 U.S.C. § 102(b), and the claim terms challenged under 35 U.S.C. § 112 are definite.

Dated: January 30, 2026

_____
United States District Judge
Franklin U. Valderrama

42